UNITED STATES of America, Appellee,

v.

Solomon ROOKS, Appellant.

UNITED STATES of America, Appellee,

v.

Percy GRAY, Jr., Appellant.

Nos. 77–1841, 77–1842.

United States Court of Appeals,
Eighth Circuit.

Submitted March 13, 1978.

Decided May 19, 1978.

Rehearing and Rehearing En Banc
Denied June 14, 1978.

Robert A. Hampe, St. Louis, Mo., for Solomon Rooks.

George C. Howard, Chicago, Ill., for Percy Gray; Donald Hubert, Chicago, Ill., on brief.

Michael W. Reap, Asst. U. S. Atty., St. Louis, Mo., for appellee; Robert D. Kingsland, U. S. Atty., St. Louis, Mo., on brief.

Before VAN OOSTERHOUT, Senior Circuit Judge, HENLEY, Circuit Judge, and LARSON, Senior District Judge.*

HENLEY, Circuit Judge.

On July 7, 1977 the federal grand jury for the Eastern District of Missouri returned a two-count indictment in which Dr. Percy Gray, Jr., Solomon Rooks and Ransom Gant were named as defendants. They were charged with violations of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §§ 801 *et seq.* The first count charged in substance that between about November 1, 1976 and April 1, 1977 all three defendants conspired to traffic in controlled narcotic substances, namely heroin and cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. The second count charged that on March 31, 1977 Dr. Gray unlawfully distributed a quantity of cocaine

in violation of 21 U.S.C. § 841(a)(1).[1] The case was assigned to the docket of Chief District Judge James H. Meredith.

The defendants filed motions which were disposed of one way or another prior to the trial. Dr. Gray moved to suppress evidence of oral statements made by him to Special Agent Gene A. Crosby of the federal Drug Enforcement Agency (DEA). That motion was denied after a hearing.

Gant ultimately pleaded guilty to Count I of the indictment and testified as a government witness at the jury trial of Gray and Rooks which was conducted in late September, 1977. Both Gray and Rooks were found guilty on Count I, and Gray was found guilty on Count II of having distributed a quantity of cocaine to Agent Crosby.

In the course of the trial the government relied in large measure on the testimony of Agent Crosby, the testimony of James Charles Louis, a part-time government informer, and the testimony of Thomas Lowe who has been mentioned in the margin and who by November, 1976 had become a government informer in connection with the alleged drug activities of Gray, Rooks

---

* The Honorable Earl R. Larson, United States Senior District Judge, District of Minnesota, sitting by designation.

1. Dr. Gray and Solomon Rooks reside in St. Louis. Gant has resided in a number of places including St. Louis and Miami, Florida. In 1976 and prior thereto all three defendants were well acquainted with each other and had had prior legitimate dealings together. Another person with whom all three defendants were acquainted and with whom Gray and Rooks had had prior dealings was Thomas Lowe who figures in this case as a paid government informer.

Dr. Gray is a practicing chiropractor in St. Louis with his residence and office being located on Natural Bridge Road. Mr. Rooks has no fixed employment; he draws a disability pension from the Veterans Administration. He has been engaged in a number of business enterprises. Prior to the period covered by the indictment, Gray and Rooks were on the board of directors of a corporation known as "Help Me Help Myself" which was a non-profit enterprise designed to improve the economic situation of the black and poor in the St. Louis area. Dr. Gray was chairman of the board. Gray was also chairman of the board of directors of the

corporation that undertook to operate the Kingsland Manor Hotel (formerly the Diplomat Hotel) located on Kingshighway in St. Louis, and Rooks was a member of that board.

The Kingsland Manor Hotel venture was a failure, and the hotel is now defunct. For a time Thomas Lowe was employed as manager or assistant manager of the hotel for a stipulated salary of $15,000.00 a year which was never paid; he was discharged by Rooks allegedly on account of the fact that Lowe was permitting the hotel to be used to some extent as a house of prostitution. At one time the defendant, Gant, who has a number of occupations including those of a professional boxer and of a drum player in a band, operated a "juice lounge" in the Kingsland Manor, but he was terminated by Rooks. There is no question that in 1976 and 1977 both Gant and Lowe harbored hard feelings toward both Dr. Gray and Rooks. However, Gray and Rooks continued to have dealings with both of those individuals. The government claimed that those dealings involved the illegal drug traffic; the defendants contended that the dealings involved a legitimate business that was in the process of formation to deal in wooden pallets.

and Gant.[2] According to Agent Crosby's testimony, he was introduced to Gray and Rooks by the informer, Lowe, as "Gene Johnson" of Kansas City, Missouri. Crosby represented that he was in the business of selling binders and vacuum cleaners, but he also indicated an interest in narcotic drugs.

As stated, Gant testified as a government witness, and his girl friend, Carol Susan Hnatuik, who at times has been a drug addict and a prostitute, also testified.

Both defendants testified in their own behalf and called a number of witnesses, including Dr. Roscoeadamsquartiz Sharpe, who at the time of trial was employed by the Board of Education of the City of St. Louis in connection with its distributive education program. Dr. Sharpe is well acquainted with both Gray and Rooks.

After the defendants were convicted but prior to imposition of sentence, Rooks filed a motion for a new trial on the ground of newly discovered evidence which would tend to impeach the credibility of James Charles Louis and that of Ransom Gant. Judge Meredith held an evidentiary hearing on that motion and denied it.

In October, 1977 Rooks was sentenced to imprisonment for ten years on Count I of the indictment with the imprisonment to be followed by a special parole term of three years. Gray was sentenced on each of the two counts to imprisonment for ten years with the imprisonment to be followed by special parole terms of three years. The sentences were made to run concurrently.[3] Both defendants have appealed.

Although the appealing defendants vehemently insisted throughout the trial that they were innocent of the charges against

them, there was ample evidence from which the jury could and did find that the defendants conspired to deal in heroin and cocaine, substantially as charged in Count I of the indictment, and that Dr. Gray unlawfully delivered cocaine to Agent Crosby as charged in Count II.

For reversal, Rooks contends that the district court erred in denying his motion for a new trial, and Gray contends that prejudicial errors were committed in connection with evidentiary problems that arose in the course of the proceedings in the district court.

We affirm both convictions.

Taking up, first, the appeal of Rooks, we have examined his motion for a new trial and the transcript of the evidentiary hearing that was held in connection with the motion. In our view the showing made by Rooks did not meet the five requirements that this court has recognized with respect to motions for a new trial on account of newly discovered evidence. *See United States v. Ward,* 544 F.2d 975, 977 (8th Cir. 1976), and cases cited. Moreover, the question of whether such a motion should be granted addresses itself to the discretion of the trial court; we do not review *de novo* the factual findings of the district judge and will not reverse his action in denying a motion for a new trial on the indicated basis in the absence of a showing of clear abuse of discretion. *United States v. Atkins,* 545 F.2d 1153, 1154 (8th Cir. 1976); *United States v. Ward, supra.* Here, no abuse of discretion has been shown.

Gray seeks reversal on three grounds, only one of which merits any detailed discussion.

---

**2.** As mentioned in n.1, *supra,* Lowe harbored ill will toward Gray and Rooks, particularly the former. Lowe claimed that Dr. Gray personally owed him one year's salary as assistant manager of the Kingsland Manor Hotel. Agent Crosby testified that Lowe appeared voluntarily at Crosby's office, informed on Gray, Rooks and Gant, and offered to assist the DEA in making a case against them. His offer was accepted, and he was paid certain sums of money for his work. Prior to the appearance of Lowe at Crosby's office, the DEA had no information to the effect that any of the defendants was engaged in the drug traffic. James Charles Louis, who has regularly served as an informer and who had been acquainted with Rooks for a number of years, was also put to work on the case or became involved in the investigation.

**3.** Gant had not been sentenced when he testified for the government, a fact that came out at the trial, and we are not advised as to the ultimate disposition that was made of his case.

■ Gray argues that the government was improperly permitted to lay unjustified and unreasonable emphasis upon alleged connections between Gray and Rooks and Lydell Bud Green, a convicted narcotics dealer reputed to be one of the largest illicit drug dealers in six midwestern states. The record contains a number of references to Green in relation to the defendants; some of those references were made in the development of the government's case in chief; others were made in the course of the cross-examination of defense witnesses, including the defendants. We have gone over the record and we find that the references to Green were not irrelevant or immaterial, or improperly motivated, or unreasonable or unfairly prejudicial when considered in the light of all of the evidence in the case.

Gray contends that his secretary and a character witness called to testify on his behalf were improperly cross-examined. We consider that this contention is plainly without merit and actually is without substance.

The principal claim of Gray is that when government counsel was permitted on cross-examination to question Gray as to incriminating statements made to Special Agent Crosby, Gray's rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were violated. The "*Miranda* problem" that this contention raises is not without interest. A statement of underlying facts is necessary.

Although the conspiracy period alleged in the indictment came to an end in April, 1977, the defendants were not arrested until the indictment was returned on July 7 of that year. On that day Dr. Gray was taken into custody outside his office about 5:40 p.m. by Sergeant Clarence Harmon of the Metropolitan Police Department of St. Louis, acting on the request of federal authorities. Gray had no record of any previous arrests or convictions.

Sergeant Harmon advised Gray in general terms as to why he was being taken into custody, and advised him of his *Miranda* rights by giving him a printed waiver form setting out those rights; such a form is frequently used in the course of criminal investigations today. Dr. Gray undertook to question Sergeant Harmon about the indictment, but Harmon declined to engage in a conversation with Gray and took him to the district office of the DEA which is located in Clayton, Missouri, a short distance west of St. Louis proper.

Gray was taken into the office where he was met by Special Agent Roy Shurn who again advised Gray of his rights under *Miranda.* At this stage Dr. Gray claimed his right not to make any statement or to answer any questions.

In spite of the fact that Gray had invoked his right to remain silent, Shurn persisted in continuing the interview and in questioning Gray. His comments and questions evoked from Gray a number of exculpatory statements. Shurn asked Gray if he was acquainted with "Gene Johnson". Gray said that he had had dealings with "Johnson" but that the dealings were not related to drugs and that he had never distributed any drugs to "Johnson."

At this point Crosby entered the interrogation room and "threw off his mask" revealing his true identity and the fact that he was and had been an undercover law enforcement officer throughout his dealings with Gray and Rooks. This unexpected and somewhat dramatic revelation was understandably quite shocking and upsetting to Dr. Gray.

Having revealed himself, Crosby assumed charge of the proceedings and first asked Gray if he had been advised of his rights. Gray said that he had been advised and that he wished to remain silent. However, Crosby, like Shurn, did not terminate the interview.

Crosby stated to Gray that Crosby was going to recapitulate his dealings with the defendants, but that Gray should not answer any questions and should simply listen to what Crosby was about to say. Crosby obviously hoped and probably expected that if he continued the interview and talked about the case, Gray would not be able to resist the temptation to make some state-

ments of his own which might be damaging to him later regardless of whether they were inculpatory or exculpatory at the time they were made.

Crosby's hopes and expectations were fulfilled when Gray began to make statements in response to what Crosby was saying. Some of Gray's statements were exculpatory; others were incriminating. Dr. Gray denied that he was systematically engaged in the illicit drug business, but he admitted that he had made the particular sale of cocaine to Crosby which resulted in the charge set out in Count II of the indictment. He said that he made the sale as an accommodation to the man he knew as "Gene Johnson," and that Gray did not "make a dime" out of the sale.

Although the officers continued to interview Gray after he had claimed his right to remain silent, no contention is made that the officers used any force or threat of force to obtain admissions from Gray, or that they misrepresented anything to him, or held out any improper promises of inducements.

In overruling Gray's pretrial motion to suppress evidence of his statements to Crosby, Judge Meredith found on the basis of the evidence that after having received proper *Miranda* warnings Gray knowingly and intentionally waived his privilege against self-incrimination and his right to have counsel present at the interview, and that Gray's statements were freely and voluntarily made. In view of the undisputed evidence, it is clear that the district court found an effective waiver by Gray subsequent to his original invoking of his rights under *Miranda*.

The only witness called by the government at the trial who could have testified as to the oral in custody statements made by Dr. Gray was Special Agent Crosby. Under the ruling of the district court it would have been proper for government counsel to have proved by Crosby that Gray had made statements to him and to prove the contents of the statements.

The government elected not to take that course and throughout its case in chief no reference whatever was made to any statements made by Gray after his arrest. However, after Gray took the stand in his own defense and categorically denied his guilt, government counsel in the course of Gray's cross-examination interrogated him about the statements and their content.

Dr. Gray's answers to the questions put to him about the statements were to some extent evasive and indefinite. However, counsel was able to elicit from Gray admissions sufficient to warrant the jury in concluding that after his arrest Gray had in fact made incriminating statements. At one point in the relevant questioning defense counsel interposed an objection, but it was not based on *Miranda* grounds. We might also observe that the particular line of questioning which we have under consideration takes up only three pages of the transcript of a three-day trial.

■ There is no question that a confession or admission obtained from a person accused or suspected of crime in violation of his right to be silent or to discontinue the answering of questions is not admissible as evidence of guilt. However, the invoking of that right is not irrevocable, and it can be as effectively waived after having been claimed as it can be waived at the outset. *See Michigan v. Mosley,* 423 U.S. 96, 102–06, 96 S.Ct. 321, 40 L.Ed.2d 313 (1975); *United States v. Turner,* 565 F.2d 539, 541 (8th Cir. 1977); *United States v. Finch,* 557 F.2d 1234, 1236 (8th Cir. 1977). As those cases indicate, a later waiver may be found to have occurred in a variety of situations.

■ In the instant case we find it unnecessary to pass upon the question of the correctness of the ruling of the trial judge that Dr. Gray waived his right to be silent after having invoked it originally. We are relieved of that task because the government does not rely on that ruling. The position of the government is that even if the admissions of Dr. Gray were not admissible in evidence during the government's case in chief, nevertheless when Gray took the stand and denied his guilt the government became entitled to question him about

his prior statements for the purpose of impeaching his credibility as a witness.

We agree with the government. We think that this case falls within the rule laid down in *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), and *reaffirmed in Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975), to which rule this court adhered in *United States v. McIntyre,* 467 F.2d 274 (8th Cir. 1972), *cert. denied,* 410 U.S. 911, 93 S.Ct. 972, 35 L.Ed.2d 274 (1973).[4]

Affirmed as to both defendants.

---

**4.** Our holding on this phase of the case is not to be construed as approval of what Agents Shurn and Crosby did after Dr. Gray claimed his privilege, and we have doubt as to the correctness of the initial ruling of the district court that Dr. Gray waived his *Miranda* right to be silent after having invoked it twice. We simply hold that the limited use that the government made of Gray's admissions after Gray had denied his guilt totally while on the stand was not improper.