UNITED STATES of America,

v.

Wilbert E. HACKLEY, Appellant.

No. 79–1531.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 9, 1980.

Decided July 17, 1980.

Dennis M. O'Keefe, Washington, D. C., for appellant.

Richard C. Bicki, Washington, D. C., a member of the bar of the Supreme Court of Rhode Island, pro hac vice, by special leave of Court, with whom Carl S. Rauh, U. S. Atty.* and John A. Terry, Asst. U. S. Atty., Washington, D. C., were on brief, for appellee.

Before TAMM and MacKINNON, Circuit Judges, and OBERDORFER **, United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge MacKINNON.

Dissenting opinion filed by Circuit Judge TAMM.

MacKINNON, Circuit Judge:

Hackley was found guilty of attempted bank robbery,[1] 18 U.S.C. § 2113(a) in the District of Columbia on the basis of stipulated facts which had been produced by the Government in opposition to motions to suppress testimony and identification. On appeal appellant claims that the court erred in denying his pre-trial motions to suppress his confession and identification. We find that the motion to suppress was properly denied and affirm the conviction.

### (1) The Attempted Robbery

Hackley attempted to rob the Jefferson Federal Savings and Loan Association by pointing a gun at Jean Garrity, one of its tellers. However, since she was behind bulletproof glass she refused to turn over any money and instead set off the alarms. She also alerted Linda Moore, another teller who worked next to her, and both of them had an excellent opportunity for two or three minutes to have an unobstructed view of Hackley from only a few feet away (Tr. 72) under good lighting conditions. When no money was forthcoming, Hackley left the Association but not before its surveillance camera had taken his picture.

### (2) The Investigation

The attempted robbery occurred on August 18, 1978. Approximately 6 days later, on August 24th Special Agent Colvert of the Federal Bureau of Investigation showed an array of photographs to Garrity and Moore. Each witness selected the photograph of a man they thought had similar features but was definitely not the man who attempted the robbery (Tr. 55, 57). After further investigation by the authorities, both witnesses were shown a second group of photographs. The inclusion of Hackley's photograph had been included in the second array following information from a confidential informant to the FBI that Hackley was involved in the robbery attempt. Miss Garrity picked out one photograph and stated she was "70 percent sure that it was a picture of the robber but would need to see him in person to be sure". (Tr. 51) Moore also was unable to make a positive identification from the photographs, but did select two photographs of men who looked the most like the robber. (Tr. 51–53) Miss Moore also indicated she would have to see the subjects in person to

---

* United States Attorney at the time the brief was filed.

** Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. Count One. On or about August 18, 1978, within the District of Columbia Wilbert E. Hackley, wilfully, unlawfully and by force and violence and by intimidation, did attempt to take from the person and presence of Jean Marie Garrity, United States currency, belonging to and in the care, custody, control, management and possession of the Jefferson Federal Savings and Loan Association, a body corporate, the deposits of which were then insured by the Federal Savings and Loan Insurance Corporation.

be able to make a positive identification. In both instances Garrity and Moore had separately selected the photograph of Hackley as possibly being the robber. Garrity and Moore later made positive identifications of Hackley at a lineup and in court.

### (3) The Apprehension

On the basis of information from the confidential informant and other evidence, a warrant for Hackley's arrest was subsequently obtained. A group of four Special Agents of the FBI and two Metropolitan policemen[2] executed the warrant at the home of Hackley's mother at approximately 6:30 a. m. on September 8, 1978. Hackley answered the door[3] and Special Agent Colvert identified himself and the others and informed appellant of the warrant and the charges. (Tr. 7) Colvert at that time orally advised Hackley of his *Miranda* rights. (Tr. 7–8, 17–18, 33–34, 40) Hackley replied that he understood them,[4] knew what he was being charged with, that he was out of town on the day in question (Tr. 8), and told his mother in effect: "Don't worry about it, Mom, I can take care of it." (Tr. 8) Detective Fontanna of the Metropolitan Police Department was one of those present during the arrest when Colvert warned Hackley of his rights (Tr. 33–34, 40–44) and when Hackley replied that he "understood" his rights. (Tr. 34)

### (4) Interrogation

Following his arrest appellant was taken to the Washington field office of the Federal Bureau of Investigation. He was there given the printed form which sets forth his rights in the opinion in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Colvert requested Hackley to read it. (Tr. 10) After Hackley had done so in his presence he asked Hackley if he understood his rights, the nature of the charge and the fact that he was not required to sign the waiver. (Tr. 10) Hackley said, "Yes". (Tr. 10) Then at 6:49 a. m. he signed his name to the printed document which in large print stated: *"Interrogation: Advice of Rights", "Your Rights", "Waiver of Rights".*[5] He was then photographed

---

2. The group consisted of Special Agents Colvert, Favitta, Fluhardy, and Dean, and Fontanna and Dory from the Metropolitan Police Department. (Tr. 6–7)

3. There was also testimony that his mother answered the door.

4. Hardy (Assistant United States Attorney):

   "Q. Okay, Now, after Special Agent Colvert read the *Miranda* rights to Mr. Hackley, what, if anything, did Mr. Hackley say or do? Detective Fontanna:

   "A. He acknowledged that he knew his rights".

   "Q. How did he do that?"

   "A. I believe Agent Colvert asked him if he understood his rights and he said that he did." (Tr. 34)

   \*　　\*　　\*　　\*　　\*　　\*

   Special Agent Colvert testified that he recited his rights to Hackley from memory. (Tr. 18)

5. The printed form of Advice and Waiver that Hackley signed was admitted as Government Exhibit 1 and reads as follows:

INTERROGATION; ADVICE OF RIGHTS
YOUR RIGHTS

Government Exhibit 1
78–604

Place　Wash., D.C.
Date　9/8/78
Time　6:47 A.M.

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any question and to have him with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure

and fingerprinted. (Tr. 10–11) Agent Colvert testified as to these events and those which followed:

> After he [Hackley] signed the [*Miranda*] form he was—he stood up to be fingerprinted and photographed. The indication that he was willing to, at least talk to me, the only indication I have [sic] was that he was giving me background information, his height, weight, date of birth, place of employment, things like that [Tr. 21] . . . I sat him down next to me. He had to sign the fingerprint card and initial the fingerprint cards. When he was doing this, this is when I explained to him what I knew about the robbery, what I knew happened [Colvert had previously testified: that he had known what had taken place before the bank robbery and that he had been given information, and in effect been coached in this bank robbery. (Tr. 11)] and I said something like "It is a shame that this guy can get away with so many bank robberies and find somebody like you that is foolish enough to go and do it for him. He talked you into going into the bank." No reaction from him. I said: "I think you ought to think about it. I really don't think you ought to carry the full weight of this thing by yourself, especially when two other people were involved." He made no statement. I said: "Do you want to tell me about it?" The best I can recall he either shook his head or just didn't say anything.[6] He just stared ahead. I said, "Okay, I really think you ought to think about it", and I left.
>
> Q You said that two or three times "You really ought to think about it"?
> A I am sure I did.
> Q And he either remained silent or shook his head?
> A I don't recall him saying anything in response to it. It was almost like he

tried to ignore me. If at most, he just shook his head.

> Q Did you say anything along the lines that it would go better for you if you did make a statement?
> A No, sir. (Tr. 22–23)

Agent Colvert at that juncture acceded to Hackley's right to terminate the interrogation concerning the robbery and ceased questioning him at that time. Colvert then drove Hackley to the Robbery Squad of the Metropolitan Police. There was no further conversation between the two concerning the robbery on the way to the Robbery Squad. (Tr. 24)

At the Metropolitan Police office Detective Fontanna, who had participated in appellant's arrest earlier in the morning, took on the task of obtaining the background information from Hackley for the standard police office report at about 8:15 a. m. (Tr. 35) *Detective Fontanna had been with Colvert around 6:30 a. m. when Colvert orally informed Hackley of his Miranda rights at the time of Hackley's arrest and when Hackley replied that he understood them.* (Tr. 6–8, 33–34) Detective Fontanna recalled that Hackley had acknowledged that he "understood his rights". (Tr. 34) This had all happened within about two hours and Fontanna did not readvise appellant of his rights before undertaking to fill in the necessary background information on the regular police form. (Tr. 43)

While they were filling out the police form Fontanna testified that he had the following colloquy with Hackley:

> I got there and there was a typewriter there. I started to do a 163 [Police Report].
> The defendant [Hackley], at that time, asked me if I knew a girl by the name of Sharon [his cousin (Tr. 37, 46)]. He stated that she worked for the police department. I replied, "Yes, that she used to

---

or coercion of any kind has been used against me.

          Signed X Wilbert Hackley
Witness: Barry Colvert, SA, FBI, Wash., D.C. 9/8/78
Witness: Gay N. Favitta, SA, FBI, Wash., D.C. 9/8/78

Time: 6:49 A.M.

**6.** The Government proffered that Agent Favitta recalled that Hackley approximately stated he did not want to make a statement and terminated the interview. (Tr. 47)

work for the—used to be a cadet and used to work in our office." [Fontanna said he knew Sharon. "This was casual conversation". Hackley said he would like to talk to Sharon and Fontanna tried to call her but she was not working at the time. (Tr. 44)] From that I asked the defendant what he was going to do in relation to this offense? I then told him that we had—we knew about Tyrone Briscoe and another subject by the name of Ricky Jones. He then stated that he wasn't going to take it by himself. He then proceeded to tell me what had occurred the day of the robbery.

He told me that Tyrone Briscoe had set the robbery up, that Tyrone had purchased a toy pistol at People's Drug Store in the Southwest Mall. With that I got in contact with Agent Colvert and he responded to the office. (Tr. 36–37) [The time was shortly after 9:00 a. m. (Tr. 12)]

Fontanna did not make notes of what Hackley told him about the robbery and did not include Hackley's short statement in the Police Report he was filling out. (Tr. 45)

### (5) The Confession

When Fontanna called Colvert back to the office, he stated that Hackley had, or was going to make a statement. (Tr. 26) When Colvert arrived, he found Fontanna still filling out the 163 form. Agent Colvert had twice advised Hackley of his rights, once at the time of his arrest and later when they were at police headquarters and Hackley had signed the printed notice and waiver,[7] and he did not readvise him again when he returned a short time thereafter to hear his confession. (Tr. 27) Colvert was also aware that Hackley had been arrested on one or two prior occasions, had

spent time in a juvenile facility and was not unfamiliar with the workings of the criminal justice system. (Tr. 16–17) Colvert testified:

> I took off my coat, just sat down next to Mr. Hackley. The best I can recall Detective Fontanna said something like, "He says Briscoe was with him." I said at that point, "Do you want to tell me about it?" He says, "I don't." I said, "You got tired of having to handle this thing all yourself, the weight yourself?" He said, "Yes, I am not going to take it myself." Then he gave a statement.[8]

(Tr. 27).

When Hackley finished giving his statement, he identified and signed the surveillance photograph of him that had been taken by the automatic bank camera. This interrogation occurred about two hours after Colvert had informed Hackley of his *Miranda* rights and after he had signed the "Waiver of Rights". Hackley never at any time requested a lawyer or indicated he wanted to stop telling about the attempted robbery.

Hackley did not testify at the suppression hearing and the testimony of the four witnesses (Colvert, Fontanna, Garrity and Moore) given at that time was not controverted in any respect.

### (6) The Court's Rulings

The trial court found that the confession made to Colvert approximately two hours after he was fully advised of his *Miranda* rights was admissible. However, the court ruled: "I have excluded that portion of Detective Fontanna's testimony that would reflect a confession". (Tr. 109) We therefore discuss Fontanna's colloquy with Hackley with respect to *Miranda*.

---

**7.** Note 5, *supra*.

**8.** When Hackley responded "I don't," but then promptly proceeded to tell all about the robbery, he was most likely indicating that he preferred not to tell about it but had decided not to bear the full weight himself. This interpretation is more consistent with reason and common sense than the contrary, as suggested by the dissent, because Hackley had, within

very few minutes, just told Detective Fontanna "what happened the day of the robbery". (Tr. 36–37) Fontanna was still filling out the 163 form when Colvert arrived. Why would Hackley not give the same statement to Colvert that he had just volunteered to Fontanna? It was Hackley, not Colvert, who was going ahead at "full steam", both with Fontanna and Colvert.

#### (7) Hackley's Initial Admission

As indicated above, while Fontanna and Hackley were filling out the police report form, Hackley interrupted it to talk about his cousin Sharon. Following that part of the conversation Detective Fontanna asked Hackley, "what he was *going to do* in response to the holdup" (Tr. 37, 44) (Emphasis added). Under *Miranda* it was generally improper to interrogate Hackley about the bank robbery after he had refused to discuss it with Colvert, but Fontanna's inquiry followed the casual conversation about Hackley's cousin Sharon and their attempt to reach her on the telephone, and, fairly construed, it was not directed at obtaining a confession.[9] The normal response one would expect from Hackley to Fontanna's question, in view of Hackley's earlier statement that he was out of town on the day of the robbery, would be a statement that he was pleading not guilty, or that he wanted a lawyer, or, as he had indicated to Agent Colvert, that he did not want to talk about it. A fair reading of the record indicates that Hackley's reply was unexpected. However, instead of answering, or not answering, in the vein that might have been expected, Hackley blurted out a complete confession in just a few sentences. Fontanna's inquiry did not call for a confession and, under the circumstances of this case, it would be unreasonable to interpret *Miranda* as requiring a third *Miranda* warning by a person who was present as one of the arresting officers a short time previously when the first *Miranda* warning was given and who heard Hackley's reply that he "understood" his *Miranda* rights. It is also significant that Fontanna's question related to the same crime that had been the subject of the initial *Miranda* warning.

What is significant about the colloquy which produced Hackley's initial admission is that the response by Hackley, while not completely unresponsive, did exceed the answer that the question called for or that could have been reasonably expected by Fontanna. Hackley's reply indicated that Colvert's suggestion that he should not bear the whole weight of the crime himself, legitimately given after proper *Miranda* warnings, had on reflection by Hackley convinced him that he had been used by Briscoe and Jones and he should not carry the full weight of the crime.

At this point is added a quotation from the Supreme Court's opinion in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), decided while the rest of this opinion was circulating:

> Since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.
>
> . . .
>
> *The case thus boils down to whether, in the context of a brief conversation, the officers should have known that the respondent would suddenly be moved to make a self-incriminating response.* Given the fact that the entire conversation appears to have consisted of no more than a few off-hand remarks, we cannot say that the officers should have known that it was reasonably likely that Innis would so respond. This is not a case where the police carried on a lengthy harangue in the presence of the suspect. Nor does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly "evocative." It is our view, therefore, that the respondent was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him. . . . It must also be established that a suspect's incrimina-

---

**9.** Generally, interrogation must cease when a defendant has indicated he wants to remain silent, but law enforcement officers may continue in any area where the defendant is willing to talk. *Smith v. United States*, 505 F.2d 824, 829 (6th Cir. 1974). In *Smith*, as in the instant case, the statement being admitted was furnished by the defendant while he was providing the FBI with background information. Also, the statements were declared to have been made voluntarily and without coercion.

ting response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response. This was not established in the present case. [Footnotes omitted]

At 301, 100 S.Ct. at 1690. (Emphasis added in part). This extract from *Innis* is so applicable and controlling that no comment is necessary.

Prior to the time that Hackley admitted his participation in the robbery to Fontanna he had been fully advised of his rights and he understood them, to wit:

*First*, he had been orally advised by Agent Colvert in the presence of Detective Fontanna of his *Miranda* rights at 6:15 a. m. when he was arrested.

*Second*, he stated at that time that he understood his rights.

*Third*, at 6:45 a. m. he read his *Miranda* rights from the printed form given him by Agent Colvert and again stated he understood them.

*Fourth*, at 6:49 a. m. he signed the printed "Waiver of Rights", which signature was witnessed by Agents Colvert and Favitta.

*Fifth*, he demonstrated that he understood his right to terminate an interview and to refuse to answer questions when he exercised that right shortly after 6:49 a. m. when he told Agent Colvert that he did not want to make a statement at that time and refused to do so. Agent Colvert acceded to that request.

*Sixth*, he further indicated that he understood his right to suspend any questioning when he interrupted the filling out of the report form and sought to have Detective Fontanna contact his cousin Sharon in the police department; Detective Fontanna acceded to that request.

*Seventh*, he had prior experience with the criminal justice system.

■ This is thus clearly not a case where a confession is received without the suspect being advised of his rights. Rather the issue is whether the evidence was admitted in violation of his right to have his silence respected after he had once terminated the interrogation. In refusing to give a statement to Agent Colvert and interrupting Fontanna in filling out the police form he demonstrated by such exercise of his rights that he understood his right to refuse to answer questions and to interrupt police processing. Thus, since he was fully advised of his rights and gave every indication of understanding his right to refuse to answer questions or to interrupt any questioning, and since his reply to Fontanna's casual inquiry went far beyond the question, his admission can be fairly characterized as a volunteered statement that was not the result of a violation of his *Miranda* rights.

■ In such circumstances courts must look to the totality of the circumstances surrounding the admission of the statement to determine if it was made voluntarily, *Boulden v. Holman*, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139, 22 L.Ed.2d 433 (1969); *United States v. Harden*, 480 F.2d 649, 650 (8th Cir. 1973), and whether the defendant's will was overborne or whether his confession was "the product of a rational intellect and a free will". *Townsend v. Sain*, 372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1963). When doing this, courts consider the officer's questions in light of their context and setting to see if they would lead to incrimination. *Zicarelli v. New Jersey State Commission of Investigation*, 406 U.S. 472, 480, 92 S.Ct. 1670, 1676, 32 L.Ed.2d 234 (1972). One court has stated the test to be the determination whether the behavior of the law enforcement officer, who elicited the statement from the defendant, was such as to overbear his will to resist and bring about a confession not freely self-determined. *United States v. Tafoya*, 459 F.2d 424 (10th Cir. 1972). No evidence in this case could lead to such a conclusion. An unsolicited remark by the defendant, not in response to any interrogation, is not even within the *Miranda* rule. *United States v. Trosper*, 450 F.2d 319, 320 (5th Cir. 1971). Further, even though a defendant invokes the right to be silent, this invocation may also be revoked or waived. *United States v. Rooks*, 577 F.2d 33, 37 (8th Cir. 1978), *cert. denied*, 439 U.S. 862, 99 S.Ct. 183, 58

L.Ed.2d 171. And the waiver of the right to remain silent need only be established by the preponderance of the evidence, not beyond a reasonable doubt. *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *United States v. Wiggins*, 509 F.2d 454, 461 (D.C.Cir. 1975). In line with these cases and considering the totality of the circumstances surrounding the statement made to Fontanna, we conclude that Hackley was afforded his *Miranda* rights; and that his statement was voluntarily given and should have been admitted by the trial court.

The Court's memorandum stated it was excluding the few statements made to Detective Fontanna because Fontanna was unaware that Hackley had been given a second *Miranda* warning and had signed his written waiver of his *Miranda* rights.

> "Because *Detective Fontanna* had no knowledge of defendant's written waiver of *Miranda* rights and did not repeat the *Miranda* warning that was orally given at the time of arrest, the Court will not admit into evidence the statements made to him. The statements made to Agent Colvert will be admitted."

(Emphasis added) However, Detective *Fontanna's* lack of knowledge of the *second Miranda* warning given by Agent Colvert (and the waiver) is not determinative of the admissibility of Hackley's statement to Fontanna.[10] What is critical on that issue is whether *Hackley* knew, understood, and voluntarily and knowingly waived his *Miranda* rights after being fully advised thereon. It would have been better, and a safer procedure, if Fontanna had advised Hackley of his *Miranda* rights a third time, but it is understandable that since he had been present when Hackley had been advised of his rights less than two hours before, and had heard Hackley acknowledge he understood them, that he would not repeat them when he was merely undertaking to fill out a report form calling for identifying data on Hackley. Fontanna had no

reason to suspect that Hackley was going to volunteer the information that he did about the details of his participation in the crime. That Hackley chose that time to make a critical admission should not defeat its admissibility.

■ That Fontanna was not aware of the second *Miranda* warning by Colvert, and that Hackley had signed a waiver, does not in any way affect *Hackley's knowledge* of his rights—and it is Hackley's knowledge that is determinative. Detective Fontanna's lack of such knowledge does not make inadmissible an admission that Hackley gave knowingly, intelligently and voluntarily after being fully advised twice of his rights and having waived them in writing. We thus hold that Fontanna's failure to give a third *Miranda* warning and Fontanna's lack of knowledge of the second warning and waiver did not render inadmissible Hackley's confession given as an excessive response to a casual inquiry.

We have considered whether the circumstances call for a remand to the district court to determine whether Fontanna's inquiry constituted impermissible "interrogation" under *Innis, supra*. The same suggestion, however, was advanced by the dissent in *Innis*, 446 U.S. at 315, 100 S.Ct. at 1697, and it was rejected by the majority—which applied its ruling on the basis of the evidence on record. Since the circumstances here fall far short of any conduct that might be deemed as even approaching the inducement in *Innis*, where the officer's conversation within the hearing of the suspect did trigger his incriminating statement, we find the record to be adequate for a decision. The entire conversation between the parties here was fully reported and there is nothing to indicate that Fontanna should have known that his casual inquiry was likely to elicit an incriminating response. Moreover, Hackley's reply to Fontanna was not admitted into evidence though his statement to Colvert did follow.

10. We assume Fontanna did not know of the second *Miranda* warning and of the signing of

the waiver. The record is silent on this point.

(8) The Right to Resume Questioning

In *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), Justice Stewart discusses the circumstances under which interrogation may be resumed after an accused in accordance with his *Miranda* warnings has elected to terminate questioning. In that case Mosley was arrested in early afternoon of April 8th in connection with recent robberies in Detroit and taken to police headquarters. He was then fully advised of his *Miranda* rights and Mosley read and signed the department's constitutional rights notification certificate. The arresting officer then began questioning Mosley about one of the robberies and when he replied that he did not want to answer any questions, the officer promptly ceased the interrogation. The arrest papers, however, were then completed (which was what was being done here when Hackley made his statement). At no time during the questioning did Mosley indicate a desire to consult with a lawyer. Mosley was then taken to the ninth-floor cellblock.

Shortly after 6:00 p. m. another police officer took Mosley from the cellblock to another office of the homicide bureau for questioning about a murder of another person in another robbery. Mosley had not been arrested on this charge or interrogated about it by the other detective. Before questioning as to this second crime the second detective informed Mosley of his *Miranda* rights. And, he again signed the form. Mosley first denied the Williams murder but after the officer told him that another person had confessed to participating in the slaying and had named him as the shooter Mosley made a statement implicating himself in the homicide. The interrogation lasted approximately 15 minutes and at no time during its course did Mosley ask to consult a lawyer or indicate that he did not want to discuss the homicide. Mosley was subsequently convicted on the first degree murder charge.

*Mosley* discusses the following quotation from *Miranda* which outlines the right of an accused to terminate interrogation:

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." 384 U.S. at 473–474, 86 S.Ct. 1602, 1627.

423 U.S. at 100–101, 96 S.Ct. at 325. As Justice Stewart remarks in *Mosley*, this passage from *Miranda* indicates when the interrogation must cease but it "does not state under what circumstances, if any, a resumption of questioning is permissible." *Id.* at 101, 96 S.Ct. at 325. *Mosley* answers this question as follows:

[A] blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests. Clearly, therefore, neither this passage nor any other passage in the *Miranda* opinion can sensibly be read to create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent.

*Id.* at 102–103, 96 S.Ct. at 326. The vast majority of federal and state courts have concluded that the *Miranda* opinion does not create a *per se* prohibition of any further interrogation once the person being questioned has indicated a desire to remain silent. *Id.* at 103 n. 9, 96 S.Ct. at 326. What is required under *Miranda* is to effectively notify an accused of his right of silence and to assure that the exercise of

that right will be scrupulously honored. *Miranda v. Arizona*, 384 U.S. at 479, 86 S.Ct. at 1630.

In *Hackley* as in *Mosley* the *Miranda* rights of the defendants were fully respected. They were carefully advised that they were under no obligation to answer any questions and could remain silent if they wished and would be furnished a lawyer any time they wished. They both orally acknowledged that they understood their *Miranda* warnings and then signed printed notification of rights forms. When they indicated that they did not want to discuss the robberies, the officers immediately ceased the interrogation and did not try either to resume the questioning or in any way to persuade them to reconsider their positions.

The subsequent admission to Fontanna was not the result of browbeating, entrapment, relentless questioning, deceptive strategies, persuasion, trickery or cajolery. Fontanna did not indulge in any persistent inquisitional questioning or in fact, in any preliminary interrogation about the crime at all. Hackley just plainly volunteered a statement that went somewhat beyond the question, and the terminology he used indicated that Agent Colvert's earlier valid suggestion had convinced him to confess. Thus, his statement to Fontanna had every indication of being given freely, voluntarily and without any improper compelling influences and with a full understanding of his *Miranda* rights.

(9) The Admission of Agent Colvert and the "Cat out of the Bag" Argument

Appellant also seeks reliance in the "cat out of the bag" theory which is described in Justice Jackson's opinion in *United States v. Bayer*, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947), to support his contention that the district court erred by admitting his statement to Agent Colvert. While in that case there was a six months interval between an invalid confession given before the accused was taken before a committing magistrate and a second voluntary confession given after proper warnings, the rea-soning of the opinion is relevant on the admissibility of second voluntary confessions that are merely an elaboration of a first invalid confession—even though we do not find the first confession to have been invalid.

Justice Jackson described the theory as follows:

Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first. *But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed.*

*Id.* at 540–41, 67 S.Ct. at 1398. The Court then held the second confession to be voluntary and admissible. In so doing it implicitly held that the "cat out of the bag" theory was not always a controlling principle.

■ So we hold here that the "cat out of the bag" theory does not preclude the admission of the confession to Colvert where the trial court found that describing the evidence available against defendant to him did not constitute coercion or overreaching, *see United States v. Pheaster*, 544 F.2d 253, 366–67 (9th Cir.), *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977) and that the Government has satisfied its burden of establishing that Hackley's statements were made voluntarily. (D.C. op., pp. 24–25).

(10) Appellant's Authorities

Appellant cites us to several cases involving successive confessions that he argues support his contention that Hackley's *Miranda* rights were violated by the court's admission of his confession to Agent Colvert. *Darwin v. Connecticut*, 391 U.S. 346, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968), involved an interrogation conducted before

*Miranda v. Arizona, supra,* or *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) and thus is not relevant except upon the issue of voluntariness. 391 U.S. at 349, 88 S.Ct. at 1489. Moreover, the decision on its facts is distinguishable because the first confession was clearly obtained in violation of defendant's constitutional rights in that he was held incommunicado for 38–40 hours, constantly questioned, and the authorities were unable to gain access to him to serve a writ of habeas corpus. The other cases relied upon, except *Killough, infra,* followed *Miranda* but all involve a first confession which was obtained without advising the suspect of his *Miranda* rights. See *Killough v. United States,* 315 F.2d 241 (D.C.Cir.1962) (first confession obtained before accused given his preliminary hearing); *Evans v. United States,* 375 F.2d 355 (8th Cir. 1967) *rev'd on other grounds* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (advice prior to first confession as to right to counsel fell short of constitutional requirements); *Gilpin v. United States,* 415 F.2d 638 (5th Cir. 1969) (failed to advise of his right to counsel; *United States v. Pierce,* 397 F.2d 128 (4th Cir. 1968) (no finding of duress—defendant merely not advised of his rights before the first admission); *Ruffin v. United States,* 293 A.2d 477 (D.C.Ct.App.1972) (first confession obtained under duress, case remanded for hearing on voluntariness of second confession).

The decision in *Boykins v. United States,* 366 A.2d 133 (D.C.Ct.App.1976), also cited by appellant, does not aid appellant's argument as the court held that a second confession was not directly produced by the existence of the earlier invalid confession which had been obtained without advising Boykins of his *Miranda* rights. Ten days after the first confession, Boykins had signed a waiver of his *Miranda* rights (including his right to counsel) and, *without his counsel in the first case being present,* the FBI interviewed him concerning another crime. In the process of that interview Boykins *volunteered another* confession to the first crime (in the absence of his counsel). Thus, *Boykins* in respect to the suspect's statement

exceeding the inquiry is similar to *Hackley.* In such circumstances the *Boykins* court reasoned that the subsequent valid waiver of appellant's right and the intervening time and circumstances sufficiently dissipated the effect of the prior invalid confession.

Thus, all of the cases relied upon by Hackley involved a first confession where the accused had *not* been advised of his constitutional rights. Here Hackley had been *twice* advised of his constitutional rights, and signed the waiver, all within about two hours *before* he made his admission.

(11) The Motion to Suppress the Identification Testimony

■ Appellant further contends that the identification procedures were so unnecessarily suggestive and conducive to irreparable misidentification as to constitute a denial of due process of law under *Stovall v. Denno,* 388 U.S. 293, 301–302, 87 S.Ct. 1967, 1972–73, 18 L.Ed.2d 1199 (1967). We hold to the contrary and rely on *Mason v. Braithwaite,* 432 U.S. 98 (1977) and compliance with the factors outlined by Justice Powell in *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–383, 34 L.Ed.2d 401 (1972). From the totality of the circumstances we find the identifications to have been reliable. As Judge Gasch set forth in his Memorandum:

The two bank tellers each had the opportunity to view the robber for two to three minutes in very well-lighted surroundings. There is no suggestion that their attention was less than complete. The prior descriptions are consistent with the identifications. Mrs. Garrity described her identification from a photograph array as seventy percent positive and expressed a desire to see the suspect in person. She was able to make a positive identification at a subsequent lineup, as did the other witness. Less than one month passed between the robbery and the photograph array and the lineup was conducted within two months. Considering these factors and the totality of cir-

cumstances surrounding the photograph array and the lineup, the Court finds clear and convincing evidence to support the conclusion that they were not so unnecessarily suggestive as to require exclusion of the identifications made. Gov't. Br. 26–27.

## CONCLUSION

For the above stated reasons, we affirm the conviction.

*Judgment accordingly.*

TAMM, Circuit Judge, dissenting:

Although I agree with the majority that the district court properly admitted the identification testimony, I must respectfully dissent. In my view the Supreme Court's decisions in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), compel us to hold that Hackley's statement to Agent Colvert was inadmissible. I therefore believe that the case must be remanded for a new trial. Only through lip-service to precedent and legerdemain with the facts does the majority avoid this result.

After detailing the now-famous warnings, the Court stated in *Miranda* that "if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police *may not question him.*" 384 U.S. at 445, 86 S.Ct. at 1612 (emphasis added). The Court thereafter elaborated, as the majority in the case before us notes:

If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, *the interrogation must cease.* At this point he has shown that he intends to exercise his Fifth Amendment privilege; *any*

statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

*Id.* at 473–74, 86 S.Ct. at 1627 (emphasis added; footnote omitted). In *Michigan v. Mosley*, the Court explained further that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " *Id.*, 423 U.S. at 104, 96 S.Ct. at 326 (quoting *Miranda v. Arizona*, 384 U.S. at 474, 479, 86 S.Ct. at 1627, 1630).

In this case we must decide whether the police "scrupulously honored" Hackley's right to cut off questioning. Agent Colvert testified that after Detective Fontanna summoned him back to the office, he engaged in the following colloquy with Hackley:

The best I can recall Detective Fontanna said something like, "He says Briscoe was with him." I said at that point, "Do you want to tell me about it?" He says, "*I don't.*" I said, "You got tired of having to handle this· thing all yourself, the weight yourself?" He said, "Yes, I am not going to take it myself." Then he gave a statement.

Hearing Transcript at 27 (emphasis added), *quoted in* Maj.Op. at 497.[1]

The majority construes Hackley's words "I don't" as meaning that "he preferred not to tell about it but had decided not to bear the full weight himself." Maj.Op. at 497 n.8. I disagree. "I don't" just does not

---

[1] The district court excluded Hackley's earlier remarks to Fontanna. Although the Supreme Court's recent decision in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), may have shed more light on whether Fontanna's dialogue with Hackley amounted to "interrogation" under *Miranda*, the admissibility of Hackley's responses to Fontanna is not before this court. Even if it were, Hackley still retained the right to cut off questioning when Colvert entered the room: if he can change his mind about remaining silent, he surely can change it again and decide not to confess. Moreover, *Innis*, in holding that "*Miranda* safeguards come into play whenever a person in custody is subjected to either *express questioning* or its functional equivalent," *id.* at 300, 100 S.Ct. at 1689 (emphasis added), leaves no doubt that Colvert's questioning was interrogation subject to *Miranda's* strictures.

mean "I do." Hackley stated unambiguously that he no longer wished to make a statement, and no amount of semantic sleight of hand can make this fact disappear.[2]

The majority engages in a lengthy discussion in an attempt to demonstrate that Hackley knowingly, intelligently, and voluntarily waived his right to remain silent, the general constitutional standard for waivers. Assuming arguendo that they have succeeded in their effort, they have not addressed the other of *Mosley's* dual requirements; namely, that the police honor *scrupulously* the accused's invocation of his right to cut off questioning.[3] The majority does conclude that the police "immediately ceased the interrogation and did not try either to resume the questioning or in any way to persuade [Hackley] to reconsider [his] position." *Id.* at 502. Again, this assertion simply ignores what happened. When Hackley declined to make a statement, Colvert persisted in his interrogation. Colvert was not asking Hackley, cautiously and without any overtones of coercion, to reconsider his decision, a course of action some courts would permit. *See United States v. Smith*, 608 F.2d 1011 (4th Cir. 1979); *Wilson v. Henderson*, 584 F.2d 1185 (2d Cir. 1978), *cert. denied*, 442 U.S. 945, 99 S.Ct. 2892, 61 L.Ed.2d 316 (1979).[4] Likewise, Colvert was not simply attempting to clarify an ambiguous response from Hack-

ley. *See Nash v. Estelle*, 597 F.2d 513 (5th Cir.) (en banc), *cert. denied*, 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979). Rather, he was continuing his interrogation in the face of Hackley's refusal to talk, and he succeeded in eliciting a statement through a time-proven interrogation technique: suggesting to the suspect that he is better off incriminating his accomplices—and himself—than facing the consequences alone. Colvert thus did not honor, scrupulously or otherwise, Hackley's right to cut off questioning.

Despite the majority's efforts, no tinkering with the facts can put this case on all fours with *Mosley*. In *Mosley*, the Court found three factors significant in allowing the statements to be admitted: (1) the police immediately ceased interrogation when Mosley asked that they stop and did not resume until two hours had passed; (2) they repeated the *Miranda* warnings, including the right to terminate interrogation, when they reopened questioning; and (3) they discussed a different crime entirely. 423 U.S. at 104–05, 96 S.Ct. at 326–27. Here, Colvert did *not* stop interrogating Hackley but continued full steam, without interruption; he did *not* rewarn Hackley that he could remain silent; and he did *not* raise a different subject matter but persisted in asking Hackley about precisely the same topic he had refused to discuss a bare moment earlier.[5]

2. Had Hackley's words appeared in a verbatim transcript and had contextual evidence supported the majority's construction, I might have been willing to accept that construction as an interpretive gloss giving life to the sterile printed word. We are not discussing a transcript, however, but Colvert's own recollections of what happened. Thus, we have before us his impression of how Hackley's words sounded in context, and that impression, as reported to the court, indicates Hackley refused to talk. Despite what he understood as a refusal, Colvert continued his questioning.

3. *Michigan v. Mosley*, 423 U.S. at 107–11, 96 S.Ct. at 328–30 (White, J., concurring in the result) (construing the majority's opinion as requiring both voluntariness and a scrupulous honoring of the right to terminate questioning); Note, *Interrogation of the Silent Suspect: Another Look at the Miranda Doctrine*, 62 Iowa L.Rev. 291, 297 (1976) (same).

4. Not all courts have agreed with this principle. See, e. g., *United States v. Massey*, 550 F.2d 300, 308 (5th Cir. 1977); *United States v. Crisp*, 435 F.2d 354, 357 (7th Cir. 1970) (if the suspect decides not to talk, "the interrogator must not be permitted to seek a retraction"), *cert. denied*, 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116 (1971). Indeed, the majority position in *Wilson* drew a strong dissent. See 584 F.2d at 1192–95 (Oakes, J., dissenting). I intimate no view on how I would vote in a case involving an unadorned request to reconsider a refusal to talk.

5. I do not mean to suggest that *Mosley* requires all three of these factors be present in each case, although some believe that at a minimum a person in custody must be rewarned when the police resume questioning, see, e. g., Kamisar, *Brewer v. Williams, Massiah, and Miranda: What Is "Interrogation"? When Does It Mat-*

*Miranda* and its progeny spring from a frank realization that we do not fully understand the workings of the human mind—in particular, that we cannot be sure what external circumstances can overcome the will of a person in custody. Informing the accused of his rights, it is thought, works to dispel the inherently coercive environment of confinement. *Miranda v. Arizona*, 384 U.S. at 469, 86 S.Ct. at 1625. *Accord, Michigan v. Mosley*, 423 U.S. at 104, 96 S.Ct. at 326. Among these rights is the right to remain silent, and the Court has made clear that to make this right meaningful, interrogation must cease if the suspect so desires. To "permit the continuation of custodial interrogation after a momentary cessation," the Court has found, "would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned." *Id.* at 102, 96 S.Ct. at 326. Similarly, continuing questioning despite the accused's wish that it stop can create the impression that the police did not really mean what they said when they told him he could cut off interrogation at any time. *See United States v. Hernandez*, 574 F.2d 1362, 1369 (5th Cir. 1978).[6] Because I believe the police in this case did not follow the clear dictates of *Miranda*, as construed by *Mosley*, I would reverse the conviction and remand the case for a new trial at which Hackley's statement to Colvert would be excluded.

*ter?*, 67 Geo.L.J. 1, 72 (1978). I raise these factors to emphasize that Hackley's case is not identical to *Mosley* and to show how the police failed to honor scrupulously his right to terminate interrogation.

**6.** A single question, one might be willing to conclude, would not seriously disturb the right to cut off questioning. Nevertheless, because *Miranda* is a prophylactic rule that tries to prevent police incursions into an individual's privilege against self-incrimination, its contours must be clear so that police know what they

may and may not do. Only last term the Supreme Court reiterated that the rigidity of the *Miranda* rule is justified because the need to give police and courts specific guidelines outweighs the burdens on law enforcement created by abandoning traditional fifth amendment voluntariness analysis. *Fare v. Michael C.*, 442 U.S. 707, 718, 99 S.Ct. 2560, 2568, 61 L.Ed.2d 197 (1979). Any attempt to permit some questions but not others would create only confusion.