UNITED STATES of America

v.

John W. HINCKLEY, Jr.

Crim. No. 81–306.

United States District Court,
District of Columbia.

Nov. 17, 1981.

Charles F. C. Ruff, U. S. Atty., Roger M. Adelman, Asst. U. S. Atty., Washington, D. C., for United States.

Williams & Connolly, Vincent J. Fuller, Gregory B. Craig, Judith Miller, Lon Babby, Washington, D. C., for defendant.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

The defendant John W. Hinckley, Jr. is charged in a multi-count indictment with attempted assassination of the President of the United States, 18 U.S.C. § 1751(c); assault on a federal officer—United States Secret Service agent, 18 U.S.C. § 111; use of firearm in commission of a federal offense, 18 U.S.C. § 924(c); and other District of Columbia Code offenses,[1] all allegedly committed on March 30, 1981. The indictment was returned on August 24, 1981.

Counsel for the defendant have filed a number of pretrial motions, four of which are addressed in this Memorandum Opinion. Two motions seek to suppress statements, and any fruits thereof, made by Hinckley during the course of court-ordered examinations dealing with his competency to stand trial and the defendant's mental condition at the time of the alleged offenses and legal responsibility for the acts charged in the indictment. The orders were entered on March 31, and April 2, 1981. The remaining two are (1) a motion to suppress statements made by Hinckley to law enforcement officials on March 30, 1981, the day of his arrest; and (2) a motion to suppress certain documents seized from the defendant's cell in July, 1981 by correctional officers at the Federal Correctional Institution, Butner, North Carolina (Butner) where he was held as a pretrial detainee for mental evaluation.

Part I of this opinion presents an analysis of the legal issues arising out of the March 31st and April 2nd court-ordered examinations. Part II addresses the factual and legal issues arising from the statements made by Hinckley when he was arrested and the seizure of his documents by the correctional staff at Butner.

The Court determines that the appellate decisions of this jurisdiction provide solid support for the court-ordered evaluations and examinations. Accordingly, the defendant's challenges should be rejected.

As to the statements made by Hinckley at the time of his arrest and the seizure of certain personal papers and documents at Butner, the Court determines that the March 30 statements and the documents seized at Butner should be suppressed. The reasons for these conclusions are set out in the discussion which follows.

## PART I

### THE COURT–ORDERED EXAMINATIONS

#### Background

On March 31, 1981 Magistrate Arthur Burnett ordered an examination to determine Hinckley's competency to stand trial. The examination was conducted on April 1, 1981, by Dr. James L. Evans, a psychiatrist, who reported that the defendant was competent. On April 2, 1981 Chief Judge William B. Bryant issued an order for an examination to determine Hinckley's: (1) competency to stand trial; and (2) mental condition and legal responsibility for his actions on March 30, 1981. Under Judge Bryant's order the defendant was committed to Butner, where he underwent physical, psychiatric and a battery of psychological examinations. The examination was completed and a report submitted to the Court on July 29, 1981.

Defendant's counsel contend that the use of the examination by Dr. Evans, ordered pursuant to 18 U.S.C. § 4244,[2] is strictly limited by the provisions of the statute to a determination of the defendant's competency to stand trial; and that use of any evidence from this examination on the issue of guilt in any trial on the substantive charges would violate the statutory limitation of section 4244.

---

1. The defendant is also charged with various District of Columbia Code offenses: attempt to kill the President, 22 D.C. Code §§ 501, 3202; assault with intent to kill, assault with a dangerous weapon and assault on a public officer, 22 D.C. Code §§ 502, 505(b), 3204; carrying a pistol without a license, 22 D.C. Code § 3204.

2. A partial text of section 4244 is set out, *supra*, p. 1346.

Hinckley's counsel raise additional objections to the Butner examination: that the Court lacked authority to order a compulsory examination to ascertain the competency and legal responsibility for the alleged offenses, over the defendant's objections; that use of any statements obtained from the examination would violate Hinckley's Fifth Amendment privilege against self-incrimination; and that use of the statements—obtained in the absence of counsel—would violate his Sixth Amendment right to counsel.

The government in opposition notes that the law in this circuit is well-settled that evidence from a section 4244 examination may be utilized at trial for the limited purpose of opposing an insanity defense. The government also argues that the Butner examination was plainly permissible and consistent with the Court's inherent authority to order an examination to determine competency and responsibility; that, because evidence from the examination would only be used to oppose an insanity defense rather than to establish guilt, it would not be incriminating within the terms of the Fifth Amendment privilege; and finally, that the Sixth Amendment creates no right to the presence of counsel at a defendant's examination by government or court-ordered psychiatrists.

Because the defendant's argument and rationale for suppressing statements arising from the March 31 competency examination are subsumed in the broader objections to the Butner examination, the latter will be considered and analyzed first, followed by a discussion of the challenge to the March 31 competency examination.

## A.

Chief Judge Bryant's April 2, 1981 order committing Hinckley to Butner provided in part that the examination be conducted and a report made to the Court as to:

Whether the defendant . . ., at the time of the alleged criminal offenses, committed on or about March 30, 1981, as a result of mental disease or defect, lacked substantial capacity to appreciate the wrongfulness of his conduct or lacked substantial capacity to conform his conduct to the requirements of law; and

Whether the defendant . . ., at the time of the alleged criminal offenses, . . . as a result of an abnormal mental condition was incapable of forming the requisite specific intent, if applicable, to commit the alleged criminal offense.

The provisions of the order are consistent with the current standard in this circuit applicable to the insanity defense. *See United States v. Brawner*, 471 F.2d 969 (D.C.Cir.1972). The dual purpose commitment order was based on three sources of authority: 18 U.S.C. § 4244, D.C. Code § 24–301 [3] and the Court's inherent power to order such an examination. Defendant alleges that none of these sources authorized the examination of his sanity at the time of the offense.

Section 4244 provides, in relevant part: Whenever after arrest . . . the United States Attorney has reasonable cause to believe that a person charged with an offense . . . may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense, he shall file a motion for a judicial determination of such mental competency of the accused . . . . [T]he court shall cause the accused . . . to be examined as to his mental condition by at least one qualified psychiatrist, who shall report to the Court . . . . *No statement made by the accused in the course of any examination into his sanity or mental competency provided for by this section . . . shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding.* A finding by the judge that the accused is mentally competent to stand trial shall in no way prejudice the accused in a plea of insanity as a defense to the crime charged; such finding shall not be introduced in evidence on

---

**3.** D.C. Code provision § 24–301 provides, *inter alia*, for an examination of a defendant or an accused for purposes of determining competency.

that issue nor otherwise be brought to the notice of the jury. (emphasis added)

Defendant argues that, since the statute, by its terms, only empowers an examination to determine competency, any evidence generated at Butner is not admissible on the responsibility question. Furthermore, he argues that section 4244's prohibition on the use of any evidence obtained in an examination against a defendant on the issue of guilt prohibits its use at a later trial. In so arguing, defendant contends that his capacity at the time of the offense is a component of guilt within the meaning of the provision.

■ Even the defendant acknowledges,[4] however, that it has long been the rule in this circuit that section 4244 does not limit the use of evidence obtained in psychiatric examinations to a determination of competency. Section 4244's prohibition on the use of defendant's statements to establish guilt does not prevent their use in opposing a defendant's insanity defense. Only recently, Judge Spottswood Robinson, writing just prior to becoming Chief Judge of the District of Columbia Circuit, held that use of psychiatric testimony from a compelled examination was not inconsistent with section 4244's provision. *United States v. Whitlock*, 663 F.2d 1094, at 1106–1107 (D.C.Cir., 1980). Shortly thereafter, former Chief Judge Bazelon noted in his dissent in *United States v. Byers*, No. 78–1451, slip op. at 5–6, (D.C.Cir., Dec. 24, 1980), that "this [circuit] court has consistently interpreted § 4244 to

permit the admission of defendant's statements to a government psychiatrist where they are relevant only to the issue of sanity." (footnote omitted). *Accord, United States v. Bennett*, 460 F.2d 872, 878–79 (D.C.Cir.1972); *Edmonds v. United States*, 260 F.2d 474, 476 (D.C.Cir.1958), *cert. denied*, 362 U.S. 977, 80 S.Ct. 1062, 4 L.Ed.2d 1012 (1960). And although *United States v. Alvarez*, 519 F.2d 1036 (3d Cir. 1975) and *United States v. Malcolm*, 475 F.2d 420 (9th Cir. 1973) suggest that the construction of "issue of guilt" in section 4244's ban on use of psychiatric evidence includes consideration of the insanity question, this is plainly not the rule in our circuit.[5]

■ Even without regard to the court's specific statutory authority, for more than twenty years it has been the rule in this circuit that the "federal courts have inherent power—indeed, a solemn obligation—to call for a psychiatric evaluation of criminal responsibility in a case where it is obvious that the trial will revolve around the issue of the accused's mental state at the time of the crime." *Whitlock*, at 1106, citing *Winn v. United States*, 270 F.2d 326, 328 (D.C.Cir. 1959), *cert. denied*, 365 U.S. 848, 81 S.Ct. 810, 5 L.Ed.2d 812 (1961). This inherent authority is well-recognized throughout the federal courts. *See e. g., United States v. Reifsteck*, 535 F.2d 1030, 1033 (8th Cir. 1976); *United States v. Cohen*, 530 F.2d 43, 47 (5th Cir.), *cert. denied*, 429 U.S. 855, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976); *United States v. Julian*, 469 F.2d 371, 375–76 n.7 (10th Cir. 1972); *United States v. Mattson*, 469 F.2d 1234, 1236 (9th Cir. 1972), *cert.*

---

**4.** In response to the Court's questioning of defense counsel as to his position on the use of evidence from a section 4244 examination, counsel focused on the effect of the Supreme Court's recent decision in *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), discussed *infra*, in reversing the circuit's long-standing rule. He stated:

> I think the decisions [of this] circuit which historically permitted the use of psychiatric testimony in this posture . . . must be reevaluated and reconsidered in [light of] *Estelle*. Transcript of argument on motions to suppress, October 27, 1981 at 11.

**5.** This circuit's reading of a distinction between the use of compelled psychiatric evidence to

establish guilt and to establish sanity in section 4244 also finds support in Rule 12.2, Fed.R. Crim.P. Rule 12.2(c), which empowers the court to order a defendant who raises the insanity defense to submit to a psychiatric examination by government experts, also bars the use of evidence obtained in such a test on the issue of guilt. Since the *sole* purpose of an examination ordered under Rule 12.2(c) would be to provide the government with evidence to establish defendant's capacity, it would make little sense to read this prohibition—virtually identical to that in section 4244—to prohibit use of that evidence on the issue of insanity.

*denied,* 410 U.S. 986, 93 S.Ct. 1513, 36 L.Ed.2d 183 (1973). Defendant's argument that this widely accepted rule is inapplicable in this case because defense counsel immediately sought a complete examination on its own is unavailing. Although some of these decisions note defendant's inability to afford psychiatric counsel, the basis for the court's power in this regard is "not only to protect the rights of the accused, but also to protect 'society's great interest in hospitalizing the accused if his violent act sprang from mental disorder." *Winn,* 270 F.2d at 327. The court's inherent authority to inquire into defendant's mental capacity is not limited by the defendant's inability to foot the bill. *Cf. Whitlock,* at 1097, 1106–1107 (court-ordered examination upheld even though defendant's mental capacity was evaluated by her own treating psychiatrist).

■ Here, the circumstances suggesting that defendant's mental state would be an issue at trial were more than sufficient to invoke the Court's responsibility to examine his mental capacity. Beyond the circumstances of the alleged incident itself, the Court was made aware that the defendant had been under psychiatric care immediately prior to March 30, 1981.[6] Furthermore, at the same time that Hinckley's counsel argued against committing him to Butner for examination, they too sought immediate access to raise the insanity defense.[7] These substantial indications that defendant's mental state would be an issue at trial led the court, in a sound exercise of discretion, to invoke its inherent authority to have Hinckley undergo a mental evaluation.

#### B.

Relying on the recent Supreme Court decision, *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), defendant argues that his Fifth Amendment privilege against self-incrimination and Sixth Amendment right to counsel were violated by the April 2nd commitment order to But-

ner. In *Estelle* the Supreme Court concluded that psychiatric testimony at the death penalty phase of a Texas murder trial, based upon a court-ordered psychiatric examination to determine competency to stand trial without warning the defendant that the evidence would be used affirmatively to persuade the jury to return the death sentence and without opportunity to refuse to submit to an examination for that purpose, violated the defendant's privilege against self-incrimination. Because his counsel was never notified of the examination or that evidence from the undisclosed examination would be used in the penalty phase of the proceeding, the Court also concluded that the defendant was denied the right to counsel in determining whether or not to submit to the examination.

Defendant finds support in *Estelle* for the proposition that use of statements obtained from him and conclusions reached by the Butner psychiatrists, based on those statements would be incriminatory within the meaning of the Fifth Amendment if used by the government to oppose his insanity defense. Such evidence, he argues is testimonial within the terms of the privilege.

■ The verbal content of any communication between the defendant and mental health experts may well be an essential basis for a meaningful psychiatric examination, *see id.* at 1873 n.8; *Battie v. Estelle,* 655 F.2d 692, at 699–700 (5th Cir. 1981). While this suggests that the psychiatric conclusions—in addition to defendant's own statements obtained at Butner—are composed largely of testimonial evidence, the Court cannot agree that use of this evidence to controvert defendant's insanity defense would be incriminating within the terms of the privilege. Less than a year ago in *Whitlock,* this Circuit rejected a contention that the government's use of the defendant's testimony obtained in a court-ordered psychiatric examination was incriminating within the meaning of the Fifth Amendment.

---

**6.** Transcript of April 2, 1981 proceedings before Chief Judge Bryant, at 5.

**7.** *Id.* at 8.

Had this testimony [obtained in a compelled examination] been admitted for its tendency to buttress appellant's guilt, the self-incrimination question would generate grave concern. But the challenged testimony was elicited solely for the purpose of supporting the experts' conclusions that appellant was criminally responsible for her actions at the time of the offense.

*Id.* at 1107 (footnotes omitted). Other circuits have also held that, at a minimum, where none of the statements made by defendant to the psychiatrists which implicate his commission of the offense are introduced as evidence, psychiatric testimony from a compelled examination is not incriminating. *See United States v. Leonard*, 609 F.2d 1163, 1165–66 (5th Cir. 1980); *Gibson v. Zahradnick*, 581 F.2d 75, 78 (4th Cir.), *cert. denied*, 439 U.S. 996, 99 S.Ct. 597, 58 L.Ed.2d 669 (1978); *United States v. Reifsteck*, 535 F.2d 1030, 1033–34 at n.1 (8th Cir. 1976).

Defendant argues that *Estelle's* conclusion that evidence offered at the penalty phase of a trial is incriminating within the terms of the privilege suggests that this circuit's earlier decisions presenting a dichotomy between the issues of guilt and insanity should be reevaluated. In support, he relies on a footnote in Chief Justice Burger's majority opinion in *Estelle* which discusses the Texas law prohibition on the use of statements made to psychiatrists on the issue of guilt. 101 S.Ct. at 1873 n.6. Because the footnote also cites the Third Circuit's conclusion in *United States v. Alvarez*, 519 F.2d 1036 (5th Cir. 1975), that section 4244's definition of guilt includes the insanity issue, defendant contends that the Supreme Court intended by that reference to adopt the *Alvarez* position in defining self-incrimination under the Fifth Amendment.

The defendant asks too much. Well-settled law in our circuit may not be rejected on a footnote reference. It should be recognized that *Estelle* was narrowly focused on the incriminating nature of the penalty phase of a trial involving capital punishment. Equally important, however is that, cited along with *Alvarez* was Rule 12.2(c), F.R.Crim.P., which empowers the court to compel a defendant to submit to a psychiatric examination for use at trial on the sanity question, while expressly prohibiting use of his statements on the issue of guilt. As the government noted at the oral argument of October 27th: [8]

> If that footnote was designed to bar the issue of any court-ordered psychiatric examination on the issue of sanity, for somehow sanity and guilt are intermingled and covered by the Fifth Amendment, it seems odd . . . that Chief Justice Burger would have included in his various string citations in that magical footnote, a reference to the very statute which authorizes the court to conduct that examination and to have its product used to educate the jury on the issue of sanity.

Nor can it be overlooked that Chief Justice Burger, the majority opinion author in *Estelle*, was a member of our D.C. circuit court during much of its twenty year development of defendant's rights and court's responsibilities in connection with the insanity defense. Yet he never wrote or joined in a decision adopting the position advanced by Hinckley's counsel.

 Even if the evidence obtained during the Butner examination were incriminating as well as testimonial in character, the privilege would not require suppression of the evidence in this instance. It is settled that in a case where a defendant puts his sanity in issue, he has waived his privilege with respect to the insanity question in the same manner as if he elected to testify at trial. *Estelle*, 101 S.Ct. at 1874; *United States v. Cohen*, 530 F.2d 43, 47–48 (5th Cir.), *cert. denied*, 429 U.S. 855, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976); *United States v. Albright*, 388 F.2d 719, 724–25 (4th Cir. 1968). Here defendant argues that there was no waiver with respect to the Butner examination because he did not formally put his mental state in issue until September 28, 1981 when he filed notice of inten-

---

**8.** Transcript of argument on motion to suppress October 27, 1981 at 20.

tion to raise the insanity defense. Although this was more than six months after the court-ordered Butner examination, it was obvious immediately after defendant's arrest that his mental state would be an issue at trial. And a team of mental health experts retained directly by the prosecution was granted access to the defendant by defense counsel well before the Rule 12.2 notice. Defendant's attempt to separate these consented-to tests from those objected to at Butner seeks a distinction without a difference. His agreement to be examined by the prosecution and immediately embarking on his own examinations waived any self-incrimination privilege that may have ordinarily existed.

■ Contrary to defendant's contention that the waiver arising from his Rule 12.2 notice was only prospective, it should be pointed out that decisions relying on the waiver theory focus not on what stage in the pretrial proceedings the insanity defense was noted, but simply on whether he introduced evidence on that question at trial. *See Estelle*, 101 S.Ct. at 1874; *Reifsteck*, 535 F.2d at 1033. As long as Hinckley's counsel intends to offer evidence of insanity at trial, suppression of evidence obtained from the compelled examination at Butner is not required to protect defendant's privilege against self-incrimination.

Defendant also argues that the Butner examination was conducted in violation of his right to the effective assistance of counsel under the Sixth Amendment. In *Estelle* the Supreme Court concluded that such a violation was present because the defendant's counsel was not notified in advance that the psychiatric examination would be used in the death penalty stage of trial. Finding that this examination "proved to be a 'critical stage' of the aggregate proceedings" against the defendant, the court found a violation in denying him the advice of counsel in determining whether to submit to the interview. 101 S.Ct. at 1877.

Here the defendant does not argue that he was denied counsel in determining whether to submit to the Butner examination. Rather, he claims that the Sixth Amendment required either the presence of counsel at the examination or the imposition of procedures, such as video recording of the interview sessions with the psychiatrists, to enable defense counsel to reconstruct the examination. Defendant does not explain why he did not seek these procedures at the time of commitment to Butner, nor why there was no similar objection to the absence of such safeguards during examinations by government-retained experts.

■ Even absent these inconsistencies, however, defendant's position finds little support. The right to have counsel present during psychiatric interviewing has been consistently rejected by federal circuit courts. *See, United States v. Cohen*, 530 F.2d at 48; *United States v. Albright*, 388 F.2d at 726. The majority opinion in *Estelle* also raised the concern that presence of counsel at a psychiatric examination might be disruptive and carefully pointed out that the decision in no way suggested such a right. 101 S.Ct. 1877 n.14.

■ Nor is an audio recording of psychiatric proceedings required by the Sixth Amendment to enable counsel to reconstruct the examination. Defendant's principle reliance on *Thornton v. Corcoran*, 407 F.2d 695, 701–02 (D.C.Cir.1969) for support, is misplaced. There the court of appeals ordered audio recording of meetings between psychiatrists conducting a compelled examination in order to preserve the proceeding while it considered defendant's mandamus petition. Petitioner claimed that the Sixth Amendment entitled him to the presence of counsel or his psychiatrist at the meetings. Justice Burger, then sitting as a regular member of the D.C. Circuit, concurred in denying mandamus relief but vigorously dissented from earlier orders of the panel requiring recording of the proceedings, concluding that there was no legal basis for the Sixth Amendment claim. In *Estelle*, the Chief Justice cited his dissent in *Thornton*, noting that the Sixth Amendment holding did not extend beyond advance notice to counsel of the purpose of a psychiatric examination and the opportuni-

ty to object. 101 S.Ct. at 1877 n.14. Therefore defendant's position that psychiatric proceedings must be recorded for his benefit is without any basis.

#### C.

In light of the foregoing, the motion to suppress statements obtained during the competency examination ordered on March 31st warrants little discussion.

In the hearings before the Magistrate, the prosecutor and defendant's then-appointed counsel agreed that a competency evaluation was necessary. The Magistrate ordered a section 4244 examination on March 31st. A subsequent motion to vacate that order filed by Hinckley's retained counsel was denied. Dr. James Evans of the Forensic Psychiatry Division of the District of Columbia Mental Health Administration examined Hinckley and on April 1st reported that he understood the charges and indictment against him; was able to confer and consult with his counsel; and was competent to participate in these proceedings.

▇▇▇ Focusing on section 4244's prohibition on the use of any evidence obtained in the examination against the defendant on the issue of guilt, defendant seeks to suppress any statements made to Dr. Evans and conclusions of the doctor based on those statements from use at trial. However, as already noted in connection with the Butner motion, this circuit has determined on several occasions that the statute's definition of guilt is limited to the elements of the offense, and does not include the issue of defendant's insanity. *See supra* at 1346. Thus evidence from the examination which tends to show that the defendant did not lack criminal responsibility because of his mental state at the time of the offense is available to the government in responding to defendant's insanity defense. However, the government has the burden and the responsibility of making a clear showing to the trial court that the evidence or statements fall within that area, meet that test and are otherwise admissible. Failure to meet that burden could result in a rejection of such evidence or statements.

### PART II

## A. THE MARCH 30TH STATEMENTS

### Factual Findings

The chronology of events on March 30th beginning with the shooting at the Washington Hilton Hotel and Hinckley's later appearance before the U. S. Magistrate are not disputed in any significant detail. Various law enforcement officers including Washington D. C. police personnel, Secret Service and FBI agents testified at the suppression hearing. They all, in one way or the other, had contact with the defendant from the time he was arrested until he was taken before the Magistrate. Based on the testimony and evidence presented, the Court concludes that the defendant was denied his right to consult an attorney during custodial interrogation in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and the statements given by him at the FBI Field Office should be suppressed.

1.

Following the incident at the Hilton, Hinckley was immediately seized and transported to police headquarters in the custody of Secret Service Agents and D. C. police personnel. The group arrived at the D.C. police headquarters cellblock around 2:40 p. m. Hinckley was in the custody of law enforcement officers from that time until 11:50 p. m. when FBI agents presented him before the U.S. Magistrate.

At headquarters he was placed under arrest and then orally given his *Miranda* rights—first, by Secret Service Agent Dennis McCarthy and later by Detective Arthur Myers of the D.C. police force. Shortly thereafter he was transferred to the homicide squad interview room where Detective Myers restated that he was under arrest and read his rights to him from an official police form, "Warning As To Your Rights", PD–47. Hinckley acknowledged that he understood his rights.

The reverse side of the PD–47 form contained four waiver of rights questions to

which Hinckley could give written responses. In answer to the first two, Hinckley wrote "yes" to the questions whether (1) he read or had read to him his rights and (2) whether he understood his rights. Question 3 read "Do you wish to answer any questions?" He gave no written answer but responded orally "I don't know. I am not sure .... I think I ought to talk to Joe Bates." He identified Joe Bates as his father's attorney in Dallas, Texas. Detective Myers assured him "You have that right. I will try to get him for you." Question 4 read "Are you willing to answer questions without having an attorney present?" Again, Hinckley did not give a written answer but responded orally, "I want to talk to you, but first I want to talk to Joe Bates." [9]

Hinckley signed the PD–47 form at 3:10 p. m. and over the next several hours the police questioned and secured information from him for police department processing and booking requirements. The police made efforts to contact Attorney Bates and Detective Myers assured Hinckley that efforts were underway. In this connection he testified:

I went out to the main general area of the homicide office where various police officers were, and I related to them that [Hinckley] had said he wanted to talk to an attorney by the name of Joe Bates in Dallas, Texas, and we should try to find him and get ahold of him, and I told Hinckley that we were doing that.[10]

### 2.

Around 4:00 p. m. the D.C. police were advised that the FBI would assume jurisdiction over the case because of the involvement of the President. Thereafter FBI Agent Henry Ragle notified Hinckley that he was under arrest for violation of the Presidential Assassination Statute, Title 18 U.S.C. § 1751(a), (i). Later, around 5:15 p. m., Hinckley was then taken by Agents Ragle and George Chimel from police headquarters to the FBI Washington Field Office. When asked at the suppression hearing why the defendant was taken there Ragle testified "we would fingerprint him and photograph him and interview him, and thereafter bring him here to the courthouse." [11] Detective Myers accompanied the two agents and at that time he had already told them that Hinckley asked for an attorney; that he did not want to make a statement without an attorney present; and that the local police department was attempting to locate an attorney, Joe Bates of Dallas, Texas.[12] The defendant was held at the Field Office from 5:15 until shortly before midnight when he was presented to the U.S. Magistrate.

The FBI maintained an interview and arrest log [13] detailing the events from the time of Hinckley's arrest. Within 20 minutes of arrival at the Field Office Agent Ragle announced to him his *Miranda* rights. Ragle showed and read to him from an FBI "Advise of Rights Form", GD–395, which also included a waiver provision. Hinckley read it and signed his name below the waiver provision, however, it was clearly understood that he did not agree to waive his rights or to give a statement.[14] Hinckley said he would "answer questions but he would like to speak with his parents" and he supplied their telephone number.[15] Around the same time Agent Chimel told Hinckley that Attorney Bates had been contacted and recommended Mr. Vincent Fuller, a Washington attorney. Mr. Fuller's telephone number was listed on the log. All of this occurred well before 6:00 p. m. The FBI attempted to and did contact Hinckley's parents in Colorado. However,

---

**9.** Transcript of testimony on motion to suppress, October 26, 1981, at 235–237, Arthur Myers.

**10.** *Id.* at 237, Arthur Myers.

**11.** *Id.* at 18, Henry Ragle.

**12.** *Id.* at 244, 260, 262, 264, Arthur Myers.

**13.** Government Exhibit 2.

**14.** Transcript of October 26, 1981, *supra* at 66–67, 88–91, Henry Ragle.

**15.** *Id.* at 31–32, Henry Ragle.

the log does not reflect that any effort was extended to contact Attorney Fuller. Nor did the government offer any testimony that any effort was extended by the FBI or anyone.

Secret Service Agent McCarthy was among those who seized Hinckley at the Hilton Hotel and was at the FBI Field Office. He was with the defendant and the other law enforcement officers from 2:40 p. m. until around 7:00 p. m. when he left the Field Office. Before leaving, he gave a statement to the FBI which confirmed the fact that Hinckley wanted to consult with an attorney when he was with Detective Myers at police headquarters. McCarthy's statement, given between 6 and 7:00 p. m., read in part:

> McCarthy advised that at this time Hinckley stated that he did not wish to make any statement until he consulted an attorney at which point the interview was terminated and preliminary processing begun.[16]

Shortly before 7:00 p. m., Agent Ragle approached the defendant and asked him to respond to certain "background" questions. Hinckley stated that he would answer except for the period after his arrival in Washington, D. C. The "background" information was secured in 25 minutes and covered "his life up until he arrived in . . . Washington . . . on March 29, 1981."[17] A wide range of information was secured including Hinckley's birthdate and birthplace, physical characteristics, social security number, make of automobile and registration information, prior criminal record, educational, financial and employment and extensive medical history, family history and sibling relationships. He also gave information covering his various activities and travels for the preceding year, specific information as to where he had stayed and the fact that he had no close friend.

The government contends and implies that the agents were engaged only in a harmless interview, that the inquiries sought information required for the defendant's processing, and that they were not seeking to obtain evidence concerning possible offenses. The claim is also made that Hinckley's answers were voluntary with little if any probing or encouragement by the agents.

The government also argues that during the half-hour period the defendant was not subjected to interrogation and that the incident did not take the form of a series of questions directed to the defendant but rather was a "running type narrative" by the defendant.[18] During this "narrative" Hinckley is described as answering in "remarkable detail . . . in fact, [the agents] had to slow him down a bit because he was able to go from almost month to month and tell . . . what he did and recall different hotels."[19] The government's explanation of what happened is simply not plausible. The wide range of specific subjects covered negates their contention. Indeed, Special Agent Stephen Colo was asked "what role did you play in securing this . . . background information?" He replied, "I asked questions just as Agent Ragle asked questions concerning his background, specific data."[20]

Aside from the absence of Attorney Fuller and the fact that he was not contacted by the D.C. police or the FBI during this period is the role played by Attorney Stuart Johnson. In the late afternoon Mr. Johnson was alerted by the Magistrate of the possibility that he might be appointed to serve as counsel in an anticipated appearance of the defendant. Around 6:30 p. m. he called the FBI office, identified himself and sought access to Hinckley. He was not successful. After a second call he talked with the present prosecuting attorney, around 6:35 p. m. Again he sought access

---

16. Government Exhibit 16, p. 2.

17. Defendant Exhibit 1.

18. Transcript of October 26, 1981, *supra* at 51–54, Henry Ragle; 191–92, Stephen Colo.

19. *Id.* at 211, Stephen Colo.

20. *Id.* at 175, Stephen Colo.

to Hinckley. He was told to contact and check with Attorney Fuller. When that effort failed he again contacted the prosecutor at 6:53 p. m. and requested access; his request was granted. This was before the FBI began to seek the "background" information from the defendant. Arrangements were made for an FBI vehicle to transport Mr. Johnson to the Field Office. Within 5 minutes after arrival, 7:28 p. m., he met with FBI agents who briefed him for approximately 20 minutes as to the background information that they had just received from Hinckley and other aspects of the case.[21]

### Analysis

In addressing the admissibility of the March 30 statements, a two-part inquiry is appropriate. First, did the suppression hearing testimony demonstrate that Hinckley was subjected to custodial interrogation within the meaning of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and its progeny, and second, did Hinckley indicate to the law enforcement authorities that he wanted to see and consult with an attorney on March 30.

▮ During custodial interrogation, the request for an attorney is a *per se* invocation of an accused's Fifth Amendment rights which requires that questioning cease until he is afforded an attorney. *Miranda* 384 U.S. at 474, 86 S.Ct. at 1627; *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The testimony shows that in spite of Hinckley's statements and responses indicating his desire at the outset to talk with an attorney, the law enforcement personnel persisted in their questioning on several occasions and made no genuine or sincere effort to comply with the defendant's request.

▮ In *Miranda*, the Supreme Court imposed the now familiar procedural safeguards necessary to secure the Fifth Amendment's privilege against self-incrimination. Recognizing that the privilege is an essential mainstay of the adversary system guaranteeing the individual the "right to remain silent unless he chooses to speak in the unfettered exercise of his own will" during custodial interrogation, the Supreme Court held that no statement obtained from the accused can truly be the product of his free choice absent the benefit of preventive measures taken to dispel the compulsion inhering in custodial interrogation. *Miranda*, 384 U.S. at 458–60, 86 S.Ct. at 1619–1620, quoting *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964). The *Miranda* Court advanced the principle that during questioning, where the accused indicates that he either wishes to remain silent[22] or consult with an attorney, the interrogation must cease. When the right to counsel is raised by the accused therefore, it is the responsibility of those charged with his custody to see to it that he obtains an attorney. Until that obligation is discharged, the interrogation must be suspended.

*If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.* At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

\* \* \* \* \* \*

If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.

---

**21.** *Id.* at 104–10, 126–131, Stuart Johnson.

**22.** Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.
384 U.S. at 473–74, 86 S.Ct. at 1627 (footnote omitted).

*Miranda,* 384 U.S. at 474–75, 86 S.Ct. at 1627–1628 (emphasis added and citation omitted). In this case the testimony shows that Hinckley sought to consult with an attorney on several occasions and expressed his desire not to provide a statement.[23] Moreover, he did so in a custodial interrogation setting. Under the circumstances, the police and FBI personnel should not have pursued their interrogation until an attorney was present.

### 1.

The suppression hearing testimony compels the conclusion that on March 30, Hinckley was subjected to express questioning in a custodial setting, a situation triggering the Fifth Amendment safeguards. Only recently in *Rhode Island v. Innis,* 446 U.S. 291, 297, 100 S.Ct. 1682, 1687, 64 L.Ed.2d 297 (1980), the Supreme Court "address[ed] for the first time the meaning of 'interrogation' under *Miranda v. Arizona.*"

Innis was convicted of kidnapping, robbery and murder. Upon arrest, he was repeatedly advised of his rights and stated that he understood them, expressing a desire to consult an attorney. In a squad car, Innis interrupted a conversation between two policemen who were concerned that a handicapped child might discover the shotgun which was used in the crime. He asked the officers to stop and directed them to the weapon's hiding place.

Applying a two-prong standard to determine whether custodial interrogation had taken place, the Supreme Court concluded that since Innis had not undergone express questioning, the issue was whether he had been subjected to its functional equivalent:

> [t]hat is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to *any words or actions* on the part of the police (other than those normally attendant to arrest and custody) *that the police should know are reasonably likely to elicit an incriminating response from the suspect.*

446 U.S. at 301, 100 S.Ct. at 1689 (emphasis added and footnotes omitted).[24]

In this case to hold otherwise and adopt the government's standard for custodial interrogation which looks to whether express questioning should have been expected to evoke an incriminating response, is to ignore the unequivocal language of *Innis.*[25] That decision could not be clearer in holding that custodial interrogation for *Miranda* purposes embraces *"either* express questioning *or* its functional equivalent." 446 U.S. at 300–01, 100 S.Ct. at 1689 (emphasis added.)[26]

---

**23.** *See* Transcript of October 26, 1981, *supra* at pp. 235–37, 244, 260, 262–64, Arthur Myers; pp. 29–30, 65–67, 88–90, Henry Ragle; pp. 294, 297–99, Dennis McCarthy.

**24.** The Court defined incriminating responses as "any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial." 446 U.S. at 301, n.5, 100 S.Ct. at 1689, citing *Miranda v. Arizona,* 384 U.S. at 476–77, 86 S.Ct. at 1628–1629. Noting that the officers comments in *Innis* consisted only of several "offhand remarks," the Court refused to hold that the officers should have known that they were reasonably likely to evoke such a comment. As the Court concluded:

> This is not a case where the police carried on a lengthy harangue in the presence of the suspect. Nor does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly "evocative."

446 U.S. at 303, 100 S.Ct. at 1690.

**25.** *See* Government's Memorandum of Law in Opposition to Defendant's Motion to Suppress, p. 11 (filed October 16, 1981):

> *Innis* created a two-pronged test for determining what constituted "interrogation" for *Miranda* purposes: first, was there express or implicit questioning, and second, should the law enforcement officers have known that their actions were likely to elicit self-incriminating responses. The government does not contest the fact that Hinckley was questioned; rather, the focus of the *Miranda* analysis must be on whether the agents should have expected to elicit incriminating responses.

**26.** Significantly, in *Innis* the Court stated:

> [i]t is undisputed that the *first prong* of the definition of "interrogation" was not satisfied, for the conversation between [the two officers] included *no express questioning* of the respondent.

446 U.S. at 302, 100 S.Ct. at 1690 (emphasis added). The Court then analyzed the officers'

■ This Court need not look beyond the first prong of the standard, however, since the record establishes that Hinckley was *expressly* questioned[27] by federal agents at the Washington Field Office. The questioning of the defendant by law enforcement authorities during that time interval falls squarely within the Supreme Court's definition of custodial interrogation as provided in *Miranda* and clarified in *Innis.* Accordingly, any statements obtained from him beyond that "normally attendant to arrest and custody" must be suppressed.[28]

**2.**

Turning to the issue of whether Hinckley's right to counsel was honored, it is significant to reiterate that the Supreme Court held in *Miranda,* 384 U.S. at 474, 86 S.Ct. at 1627, that where "the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Accord, Michigan v. Mosley,* 423 U.S. 96, 104, n.10, 96 S.Ct. 321, 326, 46 L.Ed.2d 195 (1975); *Fare v. Michael C.,* 442 U.S. 707, 719, 99 S.Ct. 2560, 2568, 61 L.Ed.2d 197 (1979). More recently, in *Edwards v. Arizona,* the Court elaborated upon the additional safeguards necessary to protect the rights of an accused in custody:

> when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.

101 S.Ct. at 1884 (footnote omitted).

*Edwards* involved a defendant who, upon his arrest for charges including murder, asserted both his right to remain silent and the right to counsel on the night he was taken into custody thereby cutting off questioning. The following morning, after again being advised of his rights, but without having been provided access to an attorney, "Edwards, stated that he would talk, but what prompted this action does not appear." 101 S.Ct. at 1886. The Court found that the questioning constituted custodial interrogation occurring at the instance of authorities within the meaning of *Innis.* Thus the "statement made without having had access to counsel, did not amount to a valid waiver and hence was inadmissible." 101 S.Ct. at 1886 (footnote omitted).[29]

comments in the presence of the accused according to the second prong to determine whether the defendant had been subjected to the functional equivalent of express questioning.

27. Indeed, the government concedes that Hinckley was expressly questioned by law enforcement personnel on March 30. *See* Government's Memorandum of Law in Opposition to Defendant's Motion to Suppress, p. 11 (filed October 16, 1981). The government advances the proposition that the information obtained as a result of the express questioning should not be suppressed because the interrogation merely sought "background" information and was not expected to elicit an incriminating response. That rationale, however, contravenes the plain language of *Miranda* which recognizes that express questioning in a custodial atmosphere gives rise to Fifth Amendment safeguards against self-incrimination.

28. *Rhode Island v. Innis,* 446 U.S. at 301, 100 S.Ct. at 1689. *See also United States v. Foskey,* 636 F.2d 517, 521–22 (D.C.Cir.1980) (refusing to suppress a spontaneous utterance during booking where defendant had not invoked his *Miranda* rights). As Metropolitan Police Department Homicide Detective Arthur Myers testified, the Third Precinct Booking Form completed upon Hinckley's arrest encompasses virtually all of the information necessary to properly conduct the booking procedure. *See* Transcript of October 26, 1981, *supra* at p. 275, Arthur Myers. It bears noting in this regard that the FBI has no formal booking procedure. *See Id.* at 786, Henry Ragle.

29. Relying upon *United States v. Hackley,* 636 F.2d 493 (D.C.Cir.1980), and *United States v. Cooper,* 499 F.2d 1060 (D.C.Cir.1974), the government contends that Hinckley's statements are admissible since law enforcement authorities should be permitted to continue questioning in any area where the defendant is willing to talk. Both *Hackley* and *Cooper* predate the Supreme Court's decision in *Edwards* and neither case involved questioning in the face of a defendant's request to consult an attorney. In *Hackley,* the court refused to suppress a confession "blurted out" in response to casual conversation. *Id.* at 498–99. Although the defendant expressed a desire not to discuss the crime, he signed a waiver of rights form and never requested an attorney. *Id.* at 497. The defendant in *Cooper* refused to sign a

The facts of this case place it squarely within the standard of *Edwards v. Arizona.* Hinckley declined to waive his right to consult an attorney. Moreover, he expressed his desire on several occasions not to make a statement until he could have the benefit of consultation with counsel.[30] At no point during the intervals of custodial interrogation on March 30, did Hinckley initiate any significant conversations with law enforcement personnel. But to the contrary, the requests and advances were initiated by the latter.[31] As the Court stated:

> an accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication*, exchanges or conversations with the police.

101 S.Ct. at 1885 (emphasis added).[32]

The government mistakenly contends that the statements obtained from Hinckley on March 30 should not be suppressed because they were made voluntarily. Thus the government suggests that the statements should be admitted in accordance with the totality of the circumstances analysis set forth in *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). *Schneckloth* applied a voluntariness standard in examining the validity of a consent to a search for Fourth Amendment purposes. To apply a voluntariness standard to the admissibility of statements obtained pursuant to a custodial interrogation, however, is to dilute the right to consult an attorney. In *Edwards* for example, where the Court was presented with the right to counsel issue, it cautioned that "it is clear that *Schneckloth* does not control the issue presented in this case." 101 S.Ct. at 1884.[33]

Even assuming that Hinckley's statements during interrogation were voluntary, the record will not support a finding that the statements should be admissible because he somehow waived his right to counsel. "[A] valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards*, 101 S.Ct. at 1884 (footnote omitted).[34] Since the "background" information obtained at the Washington Field Office was not the prod-

---

waiver but never requested a lawyer and indicated his willingness to answer questions. *Id.* at 1063. In addition, the questioning in *Cooper* did not rise to the level of custodial interrogation since it entailed a visit to the defendant's home. *Id.* at 1063–64.

**30.** *See* n.23, p. 1335 *supra.* Curiously, the interrogation at the FBI Field Office commenced shortly before 7:00 p. m. At that time, law enforcement authorities were aware not only that Washington attorney Vincent Fuller had been recommended for the case but also that court-appointed attorney Stuart Johnson was en route to the Field Office. *See* Transcript of October 26, 1981, *supra* at pp. 104–108, Stuart Johnson. Indeed, Johnson arrived at Buzzard's Point within 30 minutes after the questioning commenced.

**31.** *See* Transcript *supra* at p. 19, Henry Ragle.

**32.** In so holding, the Court "emphasize[d] that it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." 101 S.Ct. at 1885.

**33.** In *Edwards*, the Court recognized that *Schneckloth*:

> specifically noted that the right to counsel was a prime example of those rights requiring the special protection of the knowing and intelligent waiver standard ... *Schneckloth* itself thus emphasized that the voluntariness of a consent or an admission on the one hand, and a knowing and intelligent waiver on the other, are discrete inquiries.

101 S.Ct. at 1884 (citations omitted).

**34.** *See Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977) (where cases involve the right to consult an attorney, "courts indulge every reasonable presumption against waiver" of that fundamental right).

Clearly an effective means of securing a fair appraisal of the respect accorded an accused's rights during custodial interrogation and determine whether there is a bona fide waiver would be to electronically record such questioning sessions where feasible.

uct of conversation initiated by Hinckley, the mere fact that he responded to persistent and express questioning does not yield the conclusion that he waived his previously expressed right to consult an attorney. Accordingly, the statements obtained from Hinckley on March 30 and the fruits thereof must be suppressed.

## B. SEIZURE OF DOCUMENTS AT BUTNER

### Factual Findings

Hinckley was committed to Butner for psychiatric evaluation and held as a pretrial detainee from April 2 to August 17, 1981, one week before return of the indictment. On July 24th and 27th, correctional officers seized from his cell several pages of his personal papers and a personal diary. His counsel claim that the seizure violated Hinckley's Fourth Amendment rights and seek to suppress the use of the seized material as evidence at trial.[35]

At the suppression hearing, testimony was offered by the manager of the Butner Mental Health Unit, the chief correctional supervisor and several correctional officers who were involved in the discovery and seizure of the materials. Because their testimony shows an indiscriminate, search and reading of the defendant's papers, the Court finds that the conduct of the Butner personnel was unreasonable. The seizure of the defendant's personal notes and diary violated his Fourth Amendment rights and the government's use of the materials at trial is prohibited.

### 1.

All inmates are advised upon arrival at Butner that correctional officers would frequently search their persons and cells for contraband. The correctional officers referred to contraband as any items which the inmate could use to harm himself: razor

blades, sharpened instruments of any kind, metal pins, or any unauthorized medications. The federal regulations define contraband as "anything that an inmate is not authorized to possess in an institution." 28 C.F.R. § 500.1(h) (1980).[36]

The correctional officers inspect all mail for contraband. The search procedures distinguish between attorney-client mail and other mail: prison regulations prohibit the reading of attorney-client mail but place no restrictions on the reading of non-attorney-client mail. As the regulations do not recognize any category of documents as non-mail, correctional officers consider documents in the cells either attorney-client or non-attorney-client mail, based upon the individual officer's judgment as to whether the document relates to the inmate's case.

### 2.

There were no special regulations or policies at Butner governing the confinement of pretrial detainees. They were treated in the same manner as inmates who had been convicted of a crime and sentenced. Although Hinckley was held as a pretrial detainee, he was subjected to security measures more stringent than those applied to the general prison population. He was placed in total seclusion; kept under 24 hour surveillance with personal checks by the guards every 15 minutes; accompanied by three guards each time he left a secured area; restricted in the receipt of correspondence and in access to prison personnel. Even his dirty laundry was searched and his trash hand-carried and disposed of in a compactor.

These security measures were intensified in late May, after Hinckley ingested a large quantity of tylenol in an apparent suicide attempt. A formal shakedown log was maintained on a daily basis by the correctional staff and they were instructed "to be

---

**35.** In their motion papers counsel claimed First, Fifth and Sixth Amendment violations. As these arguments were briefly mentioned in the papers and scarcely addressed at the hearing, the Court will consider only the Fourth Amendment claim.

**36.** The *ABA Standards for Criminal Justice, Legal Status of Prisoners*, Glossary of Terms, define contraband as "items possessed by residents of the facility that are prohibited by program policy and regulations." These standards were approved by the American Bar Association House of Delegates on February 9, 1981.

especially alert for any suicide notes, indications that he had plans to harm himself or others." [37]

The officers assigned to his confinement area believed that except for attorney-client materials they had an unlimited right to examine everything in the defendant's cell. They testified that they skimmed his papers to discover any intentions of suicide. Correctional officer Meece testified at the suppression hearing that everything in Hinckley's cell was "fair game" for purposes of a shakedown: [38] "[W]e were in charge of his security and well-being while he was there, and as far as I'm concerned, that included everything." [39] Officer Stone testified that he read freely the materials which related to Hinckley's case in the 10 to 15 searches he made of the defendant's cell: "[a]nything that they [the inmates] have in their cell is free for us to look at." [40] Officer Graham read Hinckley's personal diary regularly during the course of the 25 to 30 searches which he conducted. He reported one disturbing entry to his supervisor, Captain Hungerford.[41] This was the first time that Hungerford learned that Hinckley's personal papers were being read.

3.

On the morning of July 23, 1981, officers Meece and Stone conducted a routine shakedown of the defendant's cell while Hinckley was taking a shower. Meece searched the materials on a second bed which Hinckley used as a shelf to hold his personal effects, including writing papers and letters. The defendant kept many letters and personal papers, including attorney-client materials, in a large unmarked manila envelope.[42] As Meece searched the contents of the envelope, item by item, his attention was drawn to certain words on a

document in the defendant's handwriting. This document, written on several pages of notebook paper, was folded either in half or in thirds and was barely legible. Meece skimmed the document and handed it to Stone who was searching other portions of the cell. At that time, Hinckley knocked on the shower room door indicating that he was ready to be let out. Officer Meece showed Stone where he had found the document and then left to accompany Hinckley from the shower room. Stone quickly read the document, replaced it in the manila envelope and reported the incident to the manager of the Mental Health Unit later in the day.

Officer Stone returned to Hinckley's cell the next morning with officer Graham to conduct the routine shakedown search. Hinckley was not present. Stone again read the document and showed it to Graham. Because the two officers believed that the document presented a threat to security, they contacted the chief correctional supervisor, Captain Hungerford, that afternoon.

On the evening of July 24, 1981, at Captain Hungerford's direction, officer Graham seized the document, xeroxed and replaced it while the defendant was away from his cell. He also seized and xeroxed the defendant's diary.

On July 27, Captain Hungerford discussed the contents of the documents with the acting warden and the associate warden, and then contacted the FBI. Later that afternoon, he and an FBI agent seized the original document while the defendant was in the television room. They found the document in the large manila envelope in a smaller envelope from the defendant's father which also contained a letter from him.

---

37. Transcript of testimony on motion to suppress, October 20, 1981, at 339, Paul Hungerford.

38. Transcript of testimony on motion to suppress, October 19, 1981, at 201, Donald Meece.

39. *Id.* at 206.

40. *Id.* at 266, Elmer R. Stone.

41. The entry Graham referred to is dated July 18, 1981.

42. Counsel for the defendant argued that the document was taken from a manila envelope bearing the return address of the law firm of Williams & Connolly and marked "Attorney-Client Privilege." *See* Defendant Exhibit 2. This argument was supported by insufficient evidence.

Hungerford left a receipt on top of the defendant's papers indicating that "contraband" had been seized.

Hungerford and the agent spent at least an hour and a half attempting to decipher the document. They later turned it over to the Federal Bureau of Investigation and the prosecuting attorney. The diary remained at Butner until it was delivered to this Court after the suppression hearing.

### Analysis

The law is clear that convicted prisoners do not forfeit all constitutional protections by reason of their confinement. "There is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell*, 418 U.S. 539, 555–556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974). In *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) Justice Rehnquist, writing the opinion for the Court, noted: "[P]retrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners." *Id.* at 545, 99 S.Ct. at 1877.

In *Bonner v. Coughlin*, 517 F.2d 1311 (7th Cir. 1975), *cert. denied*, 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978), Justice Stevens, then serving as a judge for the Court of Appeals, concluded that prisoners have a qualified right to privacy:

> Unquestionably, entry into a controlled environment entails a dramatic loss of privacy. Moreover, the justifiable reasons for invading an inmate's privacy are both obvious and easily established. We are persuaded, however, that the surrender of privacy is not total and that some residuum meriting the protection of the Fourth Amendment survives the transfer into custody.

*Id.* at 1316. *See U. S. v. Lilly*, 576 F.2d 1240, 1244 (5th Cir. 1978) (a body cavity search violated the Fourth Amendment rights of one prisoner but not of another); *United States v. Savage*, 482 F.2d 1371 (9th Cir. 1973), *cert. denied*, 415 U.S. 932, 94 S.Ct. 1446, 39 L.Ed.2d 491 (1974) (the interception and photocopying of an inmate's letter violated his Fourth Amendment rights, absent a showing by the government of some justifiable purpose of imprisonment or prison security).

This Court agrees with the view adopted above: although prisoners and pretrial detainees are not entitled to the same measure of protection afforded nonincarcerated individuals, they retain at least some degree of Fourth Amendment protection. The lack of guidelines at Butner instructing the correctional officers as to what nonmail materials were permissible to read resulted in an *ad hoc* treatment of the inmates' papers. The officers who searched Hinckley's cell testified that they believed they were permitted to read anything in the cell except attorney-client material.

Despite the circumstances of his arrest, detention and attempted suicide, the residuum of Fourth Amendment protection afforded Hinckley as a pretrial detainee exceeded that recognized by the Butner officers in their search of his cell. Indeed, if the correctional officers were entitled to read all of the defendant's personal papers except for his attorney-client materials, it is difficult to imagine what remnants of Fourth Amendment protection would be left to him.

The application of Fourth Amendment protection to the defendant depends upon whether he can establish a reasonable expectation of privacy which the Butner personnel invaded. This test requires that the defendant establish: (1) that he has "exhibited an actual (subjective) expectation of privacy" and (2) that this expectation of privacy is "one that society is prepared to recognize as 'reasonable.'" *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979), quoting *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring); *Accord, Rakas v. Illinois*, 439 U.S. 128, 143, n.12, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978).

Hinckley's conduct demonstrates that he expected that his handwritten notes would remain private. He took reasonable precautions to preserve the confidentiality

of the document by placing it, folded and in nearly illegible handwriting, in a large envelope with his attorney-client materials and personal letters. Although the manager of the Mental Health Unit, Jesse James, counseled Hinckley as to the routine search procedures conducted at Butner, he never advised the defendant that his personal papers would be read. No psychiatric staff member or correctional officer advised Hinckley that his handwritten non-mail would be read. Indeed, James testified that such writings would not be read in a typical shakedown search. Furthermore, Hinckley's expectation that his writings would remain private was reasonable. The searches were conducted in his absence from the cell and no testimony was offered to show that he was aware his handwritten notes were being read.

■ As to the reasonableness of the search under the Fourth Amendment, the Supreme Court stated the test as follows:

In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it and the place in which it is conducted.

*Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). The Court finds that, under this test, the search and seizure of Hinckley's personal notes and diary was unreasonable.

■ The key element of the test is the government's justification for conducting the search. The correctional officers, in statements given to the FBI, explained that the purpose of the search was to find contraband. At the suppression hearing, the officers testified that they also searched Hinckley's cell, on their own initiative and at the instruction of Captain Hungerford, for any indication that Hinckley planned to attempt suicide. The scope of the officers' search was limited only by materials clearly marked attorney-client documents. The

manner in which the search was conducted failed to give Hinckley adequate notice that his personal papers would be read. The officers found the documents in a large manila envelope with Hinckley's attorney-client materials and personal letters.

The reading of Hinckley's personal notes and diary was an exaggerated response to the need alleged by the government. A reasonable cell search would not include such a substantial invasion of privacy. For example, the standard of reasonableness set forth by the recently enacted ABA Standards, covering the search of prison facilities and prisoners,[43] is intended to minimize invasion to personal privacy. Standard 23–6.10 provides in relevant part:

(e) All searches of prisoner living quarters and belongings should be conducted so as to minimize harm to prisoner property and to minimize invasion of privacy.

■ Courts have rejected the two justifications for reading Hinckley's personal papers set forth by the government. The Eighth Circuit found that the reading of a prisoner's mail in his cell was not necessary to a search for contraband. *Olson v. Klecker*, 642 F.2d 1115, 1118 (8th Cir. 1981). And in *Vienneau v. Shanks*, 425 F.Supp. 676 (W.D.Wisc.1977), the court found that the reading of a pretrial detainee's mail was an exaggerated response by correctional officers to preventing an attempted suicide. Despite the fact that *Vienneau* is a First Amendment case, the court's analysis is relevant. As the prison officials employed other means to protect the detainee from suicide, the Court held that the intrusion on the detainee's rights was not reasonably necessary to her security. Similarly, Hinckley was subjected to extraordinary security precautions. The need of the Butner facility to read his personal notes for the purpose of foreseeing a suicide attempt, in addition to the many other security precautions taken, was far outweighed by Hinckley's right to the privacy of his personal notes which he took every reasonable caution to secure.

---

**43.** See n. 36, *supra*.

All legitimate intrusive prison practices have basically three purposes: "the preservation of internal order and discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners." *Procunier v. Martinez*, 416 U.S. 396, 412, 94 S.Ct. 1800, 1810, 40 L.Ed.2d 224 (1974) (footnote omitted). Although the government contends that the reading of Hinckley's handwritten material was justified by the fact that he presented an extraordinary security risk, counsel failed to establish that the *ad hoc* practice by the correctional officers of reading his personal papers was a reasonable means of maintaining security.[44] There was no policy or rule at Butner instructing correctional officers to read the personal papers of inmates. Such a practice is not even mentioned in the memorandum by Captain Hungerford prescribing "Special Procedures for John Hinckley." The Court is not persuaded that a valid institutional interest is served by permitting individual correctional officers to decide, on their own and without any guidance from their supervisors, what personal papers of a pretrial detainee should be read and what papers should not be read.

A district court recently found that the reading of a prisoner's written material is justified when an officer's attention is drawn to a certain document by trigger words which suggest that the document contains evidence of a crime. In *Diguiseppe v. Ward*, 514 F.Supp. 503 (S.D.N.Y. 1981), however, the court concluded that the unconsented reading of a state prisoner's personal diary by prison employees was an unreasonable invasion of the prisoner's privacy. There, prison personnel searched prisoners' cells for dangerous weapons and contraband two days after a riot at the facility. One prison employee leafed through the pages of an inmate's personal diary, noticed an entry for the date of the riot and seized the diary to show other prison officials. The court found that prisoners "have and should have" a reasonable expectation of privacy in the contents of a personal diary. "Certainly the diary of a prisoner is no less private in nature than that of a non-prisoner. It is probably, and deservedly, more so." *Id.* at 505. The invasion of the prisoner's privacy was held to be unreasonable under the circumstances:

> The unconsented reading of plaintiff's personal diary by state correction employees having been justified by neither special considerations peculiar to the penal system, nor a reasonable expectation of securing evidence of criminal activity by the plaintiff, ... was unreasonable within the meaning of the Fourth Amendment.

*Id.* at 506 (footnote omitted).

Similarly, officer Meece was leafing through Hinckley's papers looking for contraband when his attention was drawn to certain words at the top of a page of Hinckley's handwritten notes. These words alone neither suggested a threat of criminal activity nor does the Court find that such a reading was justified by "special considerations peculiar to the penal system." Indeed, at this point, officer Meece should have determined instantly that the document concerned Hinckley's case. He had no basis for unfolding the document and reading it in its entirety. The reading of the document, which was nearly illegible, re-

---

**44.** There was no evidence to support a finding that the document was a "communication." The risk to prison security from an individual's personal papers does not compare with that presented by an inmate's communications with others. *Cf. United States v. Dawson*, 516 F.2d 796 (9th Cir.), *cert. denied*, 423 U.S. 855, 96 S.Ct. 104, 46 L.Ed.2d 80 (1975) (court found that deputy reasonably seized a note dropped on the visiting room floor by one inmate and picked up by another where prison regulation prohibited communications between inmates); *United States v. Wilson*, 447 F.2d 1 (9th Cir. 1971), *cert. denied, Polk v. United States*, 404 U.S. 1053, 92 S.Ct. 723, 30 L.Ed.2d 742 (1972) (Court upheld government's use at trial of a photocopy of defendant's outgoing letter, finding that prison officials may examine a prisoner's communications without violating his constitutional rights); *United States v. Hearst*, 563 F.2d 1331 (9th Cir. 1977), *cert. denied*, 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978) (court upheld government's use at trial of recordings of defendant's conversations with visitors while she was held in a federal detention center prior to trial).

quired a close study that was unreasonable under the circumstances.

The seizure of Hinckley's diary, similar to the situation in *Diguiseppe*, was an unreasonable invasion of the defendant's privacy. No member of the psychiatric staff instructed the correctional officers that a prisoner has a reasonable expectation of privacy in his personal diary unless the diary "contained information concerning imminent danger to inmate safety or prison security...." The only entries in Hinckley's diary relating to his safety concern his depression, both before and after his attempted suicide. The Court does not find any legitimate government interest is served by the reading of the diary.

An appropriate order will be entered.